**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION**

| | | |
|---|---|---|
| **2025 EMERY HIGHWAY, L.L.C. d/b/a** | : | |
| **Club Exotica, a Georgia Limited Liability** | : | |
| **Company,** | : | |
| | : | |
| **Plaintiff,** | : | **5:02-CV-125-2 (CAR)** |
| | : | |
| **vs.** | : | |
| | : | |
| **BIBB COUNTY, GEORGIA, et. al.** | : | |
| | : | |
| **Defendants.** | : | |

_____

### *ORDER ON MOTIONS FOR SUMMARY JUDGMENT*

Currently before the Court are the parties' cross motions for summary judgment. The present case has had an unnecessarily prolonged and frustrated history with this Court. Plaintiff 2025 Emery Highway, L.L.C. (herein "Club Exotica") is a venue that, prior to its closing on September 18, 2004, provided nude and semi-nude entertainment for its patrons. The club first initiated this action in April of 2002 seeking declaratory and injunctive relief from this Court. Since then, Club Exotica's constitutional claims and theories of relief have continued to multiply. Thus, until now, the Court's attempts to reach any resolution of the shifting theories and morphing claims raised by Club Exotica have been no more successful than an attempt to herd cats.

Yet, after a myriad of extensions of time, withdrawn motions, and prolonged delays (by both parties), this Court finally demanded that Club Exotica concisely define its claims

1

and that all claims be brought before the Court for a long-overdue review on the merits. Club Exotica complied and filed its Second Amended Complaint [Doc. 88] in October of 2004 against Defendants Bibb County, Sheriff Jerry M. Modena, and John Doe. Club Exotica's most recent complaint, however, is still an expansive recitation of allegations. At the core of the Complaint, Club Exotica alleges that the County, through its government officials and law enforcement actions, has intentionally and repeatedly impinged upon its constitutional rights as guaranteed by the First, Fourth, and Fourteenth Amendments of the United States Constitution. Following the filing of Club Exotica's Second Amended Complaint, an additional discovery period was provided. Thereafter, both Club Exotica and the County filed motions for summary judgment [Doc.s 103 & 112]. Timely responses and replies to each motion were filed. These motions are now properly before the Court.

Having considered the arguments of the parties, the relevant authorities, and all evidence cited in support of and in opposition to the motions for summary judgment, the Court finds that the County's motion for summary judgment is due to be **GRANTED** in part and **DENIED** in part. Club Exotica's partial motion for summary judgment is due to be **DENIED** in full.

## STANDARD ON SUMMARY JUDGMENT

Summary judgment must be granted if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Johnson v. Clifton, 74 F.3d 1087, 1090 (11th Cir. 1996). Only a genuine issue of material fact will defeat a

properly supported motion for summary judgment.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  This means that summary judgment may be granted if there is insufficient evidence for a reasonable jury to return a verdict for the nonmoving party or, in other words, if reasonable minds could not differ as to the verdict.  See id. at 249-52. In reviewing a motion for summary judgment, the court must view the evidence and all justifiable inferences in the light most favorable to the nonmoving party, but the court may not make credibility determinations or weigh the evidence.  See id. at 254-55; see also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact" and that entitle it to a judgment as a matter of law.  Celotex, 477 U.S. at 323 (internal quotation marks omitted).  If the moving party discharges this burden, the burden then shifts to the nonmoving party to go beyond the pleadings and present specific evidence showing that there is a genuine issue of material fact (i.e., evidence that would support a jury verdict) or that the moving party is not entitled to a judgment as a matter of law.  See Fed. R. Civ. P. 56(e); see also Celotex, 477 U.S. at 324-26.  This evidence must consist of more than mere conclusory allegations or legal conclusions.  See Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991).  Ultimately, summary judgment must be entered where "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof."  Celotex, 477 U.S. at 323.

3

## FACTUAL AND PROCEDURAL HISTORY

Plaintiff Club Exotica is a venue in Bibb County, Georgia, which, prior to its closing in September of 2004, provided erotic entertainment for its clientele. The club first opened for business in Bibb County in October of 2001.  Because no alcoholic beverages may be sold in Bibb County except under a license issued pursuant to the County's Alcoholic Beverage Code, see Bibb County, Ga., Code § 3-21, Club Exotica applied to the Bibb County Board of Commissioners for an alcoholic beverage license before it opened. In this February of 2001 application, the applicant, "2025 Emery Highway, LLC, d/b/a Club Exotica," listed its occupation as a "restaurant/nightclub operation." (Doc. 104, Deft. Ex. 1).  The County initially denied the club's application for an alcoholic beverage license, citing civil disability provisions of the Alcoholic Beverage Code, and litigation ensued. Thereafter, on October 24, 2001, an alcoholic beverage license was issued to Club Exotica, but was done so only pursuant to a settlement agreement in which Club Exotica stipulated that it would not operate as an "adult entertainment establishment." (Doc. 104, Deft. Ex. 2). Once it opened, Club Exotica began providing erotic, but not nude, dance entertainment.

On December 12, 2001, Club Exotica applied to renew its alcoholic beverage license for the 2002 calendar year.  In this second application, Club Exotica listed its occupation as "restaurant services" and represented that it had operated as such since it opened in October of 2001. (Deft. Ex. 3).  It was recommended that this application for renewal be granted in February of 2002.  (Id.)[1]

---

[1]

Although the record indicates that renewal was recommended, the record does not show that the 2002 license was ever actually issued to Club Exotica.

Shortly thereafter, on April 16, 2002, Club Exotica initiated the present action, pursuant to 42 U.S.C. §1983, seeking a declaration of its rights and liabilities under the County's Alcoholic Beverage Code and injunctive relief barring the County from infringing on its constitutional rights with respect thereto.  As a peripheral matter, the club further sought a declaration as to the constitutionality of the County's adult entertainment regulations (including provisions of its Adult Entertainment Licensing Code, Adult Entertainment Zoning Code, and Occupational Tax Code).  The club included these additional constitutional challenges even though it had not applied to operate and did not claim to operate as an "adult entertainment" venue. Club Exotica pled that all of these codes were unconstitutional both on their face and as-applied to its operations.

Primarily, in this first Complaint, Club Exotica stated that it intended to lawfully provide totally nude dance entertainment under Bibb County's regulatory scheme but anticipated that the County would act arbitrarily and with discriminatory intent to bar the club from providing nude dancing entertainment, in violation of its rights as protected by the First and Fourteenth Amendments of the United States Constitution. Club Exotica explained that it desired to operate as a "mainstream performance house" as permitted by the Alcoholic Beverage Code.  This provision would allow the club to both provide nude entertainment and lawfully sell alcohol to its patrons. (See Compl. [Doc. 1]).

The Bibb County Alcoholic Beverage Code specifically prohibits certain types of entertainment upon any premises licensed to sell, serve, or dispense alcohol - including "[l]ive entertainment where any person appears unclothed or in such attire, costume or clothing as to expose any portion of his or her *specified anatomical areas* or where such

person performs acts of *specified sexual activities* or acts which simulate specified sexual activity . . . ." Code § 3-71(c), (c)(2) (emphasis added).  Under the Code, "specified anatomical area includes . . . [l]ess than completely and opaquely covered human genitals or pubic region; cleft of the buttocks; or any portion of the female breast encompassed within an area falling below the horizontal line one would have to draw to intercept a point about the top of the areola . . . ." § 3-71(b)(9).  "Specified sexual activities . . . includes . . . [t]he fondling or other erotic touching of human genitals, pubic region, buttocks, anus or female breast; . . . [s]ex acts . . ., actual or simulated, including intercourse, or copulation or sodomy; . . . [and] [m]asterbation, actual or simulated . . . ." § 3-71(b)(10).

An exception to the prohibition against the display of *specified anatomical areas* is permitted, however, for any "mainstream performance house . . . which derives less than twenty (20) percent of its gross annual income from the sale of alcoholic beverages." § 3-71(c)(4).  It was under this "mainstream performance exception" that Club Exotica sought to offer nude dancing performances and maintain its alcoholic beverage license. Club Exotica then anticipated that it would derive less than 20% of its 2003 revenue from the sale of alcoholic beverages and would thus be eligible to lawfully provide nude entertainment under the exception.  (See Compl. at ¶¶ 31-33).

Approximately one month after Club Exotica's first complaint was filed, the Bibb County Board of Commissioners met and amended the Alcoholic Beverage Code.  On May 14, 2002, the "mainstream performance exception" was more thoroughly defined so as to provide that:

6

[t]he prohibition against display of "specified anatomical areas" shall not apply to the premises of any traditional or live performance house, museum, theater, concert hall, opera house, educational institution or similar establishment, which regularly features legitimate live performances, including plays, operas, ballets, concerts or other similar performances, and which derives less than 20 percent of its gross annual revenue from the sale of alcoholic beverages.  It is the intent of this section to require that any establishment seeking to qualify as a traditional theater must first meet the definition of traditional or live theater (mainstream performance house), as defined in [the Adult Entertainment Code, Bibb County, Ga., Code § 6-72(15)] and secondly derive less than 20 percent of its gross annual revenue from the sale of alcoholic beverages. If the cost of admission to the establishment, whether by cover charges or tickets, entitles the patrons to free drink(s), then the revenue generated by the ticket sale or cover charge is to be included in the annual revenue from the sale of alcoholic beverages.

Code § 3-71(c)(4) (2002) (Doc. 104, Deft. Ex. 6).

Thus, the Alcoholic Beverage Code, as amended in 2002, incorporated by reference the definition of a "mainstream performance house" included in the adult entertainment regulations.  Bibb County's ordinances for adult entertainment establishments, particularly the provision referred to as the "Adult Entertainment Licensing Code," regulate the licensing and operation of venues offering "adult entertainment" - defined as entertainment "characterized by an emphasis on the depiction, display or featuring of '*specified anatomical areas*.'"[2] (See Bibb County, Ga., Code § 6-71, Doc. 104, Deft. Ex. 7).

---

[2]

The Adult Entertainment Licensing Code's definition of  "specified anatomical areas"  is very much like that definition contained in the Alcoholic Beverage Code; it includes "[l]ess than completely and opaquely covered human genitals or pubic region; cleft of the buttocks; or any portion of the female breast encompassed within an area falling below the horizontal line one would have to draw to intercept a point about the top of the areola . . . ." Code § 6-72 (13).  This definition does not include "any portion of the cleavage of the human female breast exhibited by a dress, blouse, shirt, leotard, bathing suit, or other wearing apparel, provided that the areola is not exposed."  Id.

7

The Adult Entertainment Licensing Code additionally prohibits any license for adult entertainment to be issued "if the premises to be used also holds a license to sell alcoholic beverages" and provides that "[a]ny premise licensed as an adult entertainment establishment shall not be eligible to apply . . . for a license to sell alcoholic beverages for consumption on the premises." Code § 6-73(d).  The Adult Entertainment Licensing Code and Alcoholic Beverage Code are thus mutually exclusive.  A venue may either operate under a license to serve alcohol, as provided by the Alcoholic Beverage Code, or provide adult entertainment, as permitted by the Adult Entertainment Licensing Code; but under the current regulations, a single establishment may not do both in Bibb County.  See id.

Notably, like the Alcoholic Beverage Code, the Adult Entertainment Code excepts "mainstream performance houses" from its regulatory scheme. See Code § 6-72 (2).  It defines a "mainstream performance house" as

> a theater, concert hall, opera house, museum, educational institution or similar establishment, which regularly features live performances, including plays, operas, ballets, concerts or other similar performances, which are not distinguished or characterized by an emphasis on the depiction, display, or description, or the featuring of "specified anatomical areas" or "specified sexual activity" in that such depiction, display, description or featuring is incidental to the primary purpose of any performance.  Performances and showings are regularly featured when they comprise 85 percent of all performances or showings.  "Distinguished or characterized by an emphasis upon" means the dominant or principal theme of the object referenced.  For instance, when the phrase refers to performances, which are "distinguished or characterized by an emphasis upon the exhibition or display of specified anatomical areas," the performances so described are those whose dominant or principal character or theme is the exhibition or display or "specified anatomical areas" or "specified sexual activities."

§ 6-72 (15).  Thus, under the current regulations, a venue may only serve alcohol while providing totally nude entertainment *if* it qualifies as a "mainstream performance house."

Shortly after Club Exotica initiated this suit in April of 2002, the parties engaged in discovery in anticipation of a hearing on Club Exotica's motions for injunctive relief. In a teleconference held with the parties on June 3, 2002, the County represented to the Court that, in light of the present litigation, it would not take any immediate action with respect to Club Exotica and their provision of alcoholic beverages. The County further pledged that it would advise the Court prior to taking any regulatory enforcement action against Club Exotica. Club Exotica thus continued to sell alcohol to its patrons as this lawsuit proceeded. Due to the County's self-imposed restraining order, this Court likewise took no immediate action on Club Exotica's pending motion for immediate injunctive relief and focused primarily on the parties' other motions and discovery disputes.

In December of 2002, Club Exotica applied for renewal of its alcoholic beverage license for the 2003-2004 calendar year. Therein, Club Exotica again represented that its occupation was "restaurant services." (Doc. 104, Deft. Ex. 5). The County took no action with respect to this application but permitted Club Exotica to continue to sell alcohol to its patrons under its previously issued license without regulatory action being taken.

In early 2003, almost one year after this suit was initially filed, Club Exotica sought to amend its original Complaint in this case and renewed its motion for declaratory and injunctive relief. The motion to file an amended Complaint was granted in March of 2003 [Doc. 35]. In its First Amended Complaint [Doc. 36], Club Exotica reiterated its desire to operate under the Alcoholic Beverage Code's "mainstream performance exception" without interference from County regulators. Club Exotica also added new claims alleging that the County unconstitutionally amended its Alcoholic Beverage Code in May of 2002

for the sole purpose of thwarting nude dance entertainment at its venue. The club averred that both the County's motivation and procedures in amending the Alcoholic Beverage Code were unconstitutional. The First Amended Complaint likewise stated claims that both the Alcoholic Beverage and Adult Entertainment Licensing Codes were unconstitutional (for various reasons), that the County was disparately applying and enforcing provisions of the Alcoholic Beverage Code so as to intentionally discriminate against the club's establishment, and that the County was unlawfully intimidating Club Exotica's dancers in an attempt to chill the exercise of their First Amendment rights. (See First Amended Compl. [Doc 36]). Any other claims contained in the original complaint were abandoned.

On July 3, 2003, a hearing was held on Club Exotica's renewed motion for preliminary injunctive relief. (See Minute Entry, July 3, 2003 [Doc. 62]). Although the parties' preliminary briefs were comprehensive of all the claims contained in the First Amended Complaint, during the hearing, Club Exotic clarified that the sole relief sought at that time was a court order declaring that it may lawfully operate under the "mainstream performance exception" and an injunction barring the County from taking any adverse action against the club, its employees, or its patrons while it operated as such. Upon consideration of the relevant law, this Court determined that Club Exotica's claim based upon the as-applied vagueness of the mainstream performance exception was not ripe for judicial review. (Order, July 14, 2003 [Doc. 65]). In a written order, this Court found that

> Club Exotica has apparently made very little, if any, effort to establish a proposed plan of "mainstream" operation or seek an opinion from a County official having sufficient authority to render a decision in this matter. Club Exotica has never been formally advised that it may not operate as a "mainstream performance house" and maintain a license to serve alcoholic

10

> beverages.  In fact, there is no evidence that Club Exotica has ever even contacted the County to inquire as to its eligibility to operate under the exception. . . .  Moreover, in this case, it is entirely unclear as to how Club Exotica's new operations will differ from their current, and admittedly non-mainstream, performances.  During the preliminary injunction hearing, Club Exotica acknowledged that its past and current performances do not comply with the exception at issue, but assured this Court that its new performances and operations would make it eligible to provide nude entertainment under the "mainstream performance house" exception. Nevertheless, Club Exotica has apparently made no effort to develop either a formal or informal plan describing its vision of a "mainstream" operation and appeared before this Court entirely unprepared to present evidence of its proposed "mainstream" entertainment.  Thus, apparently Club Exotica not only requests that this Court assume that the County will violate its First Amendment rights when the Code is applied to them, but also expects this Court to speculate as to how Club Exotica may operate once given the opportunity.

Id. at 8-10.  This Court additionally concluded that no Court order barring the County from imposing criminal sanctions on the club, its patrons, or its employees was necessary at that time, as the County had again represented that

> such actions would not be taken against the owners of Club Exotica or its employees if it attempts to operate as a "mainstream performance house." Rather, counsel explained that in the event Club Exotica attempted such operations, the County would conduct its own investigation as to whether the requirements of the exception were being met. If, after this investigation, the County concluded that Club Exotica was operating in violation of the Alcoholic Beverage Code, it would provide Club Exotica with reasonable notification that its alcoholic beverage license may be revoked.  At that time, a license revocation hearing, "meeting all due process requirements," would be promptly scheduled and held.

Id. at 11-12.  Thus, ultimately, Club Exotica's motion for preliminary injunctive relief was denied.  On July 18, 2003, after receiving this Court's written order, Club Exotica began offering entertainment in which its female performers appeared totally nude.  The club also continued to sell alcohol to its patrons.

11

Days later, Jerry M. Modena, the Sheriff of Bibb County, issued a letter to both the Bibb County Board of Commissioners and the Tax Commissioner, requesting that Club Exotica's current alcoholic beverage license be revoked and that its pending renewal application be denied based upon "conduct of the entertainers and other employees of Club Exotica" that had occurred prior to July 3, 2003 - i.e., prior to the club's official provision of totally nude entertainment. (Doc. 104, Deft. Ex. 13).  The Bibb County Sheriff's Office had in fact begun its investigation into the operations of Club Exotica as early as April of 2002. (Doc. 104, Deft. Ex. 9, pp. 22, 29-31).  In support of his recommendation, dated July 22, 2003, Sheriff Modena alleged that Club Exotica unlawfully "employed a supervisory manager who is a convicted felon;" "allowed this supervisory manager to possess a firearm on the premises;" and provided entertainment, which "violated public indecency and obscenity laws of the state of Georgia." (Doc. 104, Deft. Ex. 13).  Neither §3-71(c) of the Alcoholic Beverage Code nor the "mainstream performance exception" were mentioned in the sheriff's letter.  See id.

Later that same day, in a regularly scheduled public hearing, the Board of Commissioners accepted the Sheriff's recommendation to revoke Club Exotica's current alcoholic beverage license and further voted to deny Club Exotica's pending 2003-2004 alcoholic beverage license application. (See Doc. 104, Deft. Ex. 14).  The Board further voted to grant Club Exotica a hearing on the proposed revocation of its current alcoholic beverage license. (Id.).  Pursuant to §3-52 of the Alcoholic Beverage Code,

> Any alcoholic beverage license issued . . . may be revoked or suspended by
> the board of commissioners . . . for cause shown, after a hearing of which
> at least three days' written notice shall be given to the licensee. Such notice

12

shall specify the time, place and purpose of the hearing, and a statement of the charges upon which such hearing shall be held.  At such hearing, the licensee shall have the right to appear in person and by attorney, and both the county and licensee shall have the right to present evidence under oath, introduce documentary evidence, cross-examine witnesses and generally present evidence of violation of this chapter or absence thereof.  Such hearing may be conducted either by the board of commissioners of the county or by one of its committees.  If the matter of the hearing is referred to a committee, the committee shall make its recommendations to the full board of commissioners of county which shall act thereon.

No action was immediately taken with respect to Club Exotica's alcoholic beverage license, and within three days of the public hearing, the Board of Commissioners informed Club Exotica of its decisions and of the club's right to a hearing on "both the denial of the license and the revocation of the current license." (Doc. 104, Deft. Ex. 14).  This July 25, 2003 letter additionally offered to set a mutually agreeable date and time for the hearing and explained that the sole purpose of the hearing would be to discuss the denial and revocation. (Id.).  Though the Alcoholic Beverage Code does not require that a neutral hearing officer preside over this type of hearing, the Board also gave Club Exotica the option of having a hearing before a neutral hearing officer or before the Bibb County Board of Commissioners.  (Id.).

In a subsequent letter, dated July 31, 2003 (Doc. 104, Deft. Ex. 15), the County further advised Club Exotica of the reasons for the revocation hearing, explaining that the Board had relied on the findings included in the July 22, 2003 letter from Sheriff Modena. The Sheriff's letter was attached and read as follows:

[Club Exotica] has allowed and countenanced the inappropriate touching of patrons by Club employees and vice versa.  The inappropriate touching has included lap dancing, prostitution, oral sodomy and many other examples of inappropriate sexual contact.  To initiate a lap dance, a patron requests

that an entertainer come to dance for him personally and tips her per song. The type of dancing includes the entertainer climbing into the lap of the patron and "grinding" her genitals on his groin area.  In addition to this, the entertainer will put her breast in the face of the patron and may bend over in front of him, placing her genitals in his face.  Lap dancing continues through more than one song if the patron chooses to continue tipping. Therefore, this contact can last from three to six minutes for one song or several more minutes through additional songs.

My investigation has revealed that when entertainers are tipped by patrons, patrons are allowed, in various manners, to make physical contact with the genitalia of the entertainers. Patrons may pull the entertainers undergarments to the side and place the dollar bills in the vaginal area, or patrons may place a bill on top of their heads and allow the dancers to squat over their heads, picking up the bills with their vagina.  Additionally, the dancers, themselves, will pull their garments to the side, exposing their vagina, so that a patron may place a tip in either their vagina or their garment.

In certain private areas of the club, patrons pay dancers for sexual services, including touching and viewing genitalia, oral sodomy and sexual intercourse. These private areas are referred to as either "VIP Area" or "Members Only Rooms." Patrons pay a fee to enter these rooms and request a certain dancer, that they have seen either on the stage or on the main floor of the bar, to join them. Inside these VIP Area and Members Only Rooms, sexual activities become actual rather than simulated.

When entertainers perform on the stage, patrons are permitted to touch the dancers' genitalia with their faces, as well as view vulgar displays of genitalia and other specified anatomical areas. Finally, the entertainers have performed many other lewd and indecent acts which are expressly prohibited by local and state law. Therefore, I make my recommendation for the denial of the requested license for Club Exotica based on this type of conduct . . . .

(Doc. 104, Deft. Ex. 13).  It was Sheriff Modena's opinion that these activities violated

Georgia criminal law and not merely the County's Alcoholic Beverage Code.  Id.

In the July 31st letter, the County further provided notice to Club Exotica that the

revocation hearing had in fact been set for August 14, 2003 at 10:00 a.m. and that it would

take place in the Chairman's conference room on the fourth floor of the Bibb County Courthouse. (Doc. 104, Deft. Ex. 15).  The County also explained that since Club Exotica had not stated a preference, it had selected a hearing officer to conduct the hearing, Senior State Court Judge Taylor Phillips.  (Id.).

Upon receipt of this notice, Club Exotica responded in a letter dated August 15, 2003, in which it expressed a number of concerns about the nature and justification of the proposed hearing. (Doc. 67, Ex. D). Among these concerns were the Board of Commissioner's reliance on the Sheriff's letter, without evidence of any actual criminal convictions, and the County's action in handpicking a state judge as the neutral arbitrator. (Id.). Club Exotica further requested that the hearing be postponed. (Id.).

The next day, Saturday, August 16, 2003, approximately 25 to 30 employees of the Bibb County Sheriff's Office raided Club Exotica. Prior to this raid, undercover agents visited Club Exotica, and based on their observations, a decision was made by Sheriff Modena to take action with respect to suspected ongoing criminal conduct at the club.  Law enforcement officers taking part in the raid were instructed to look for violations of Georgia law and that mere nudity "would not be reason to make an arrest." (Doc. 75 at p.62).  As a result of the raid, a number employees were arrested; sixteen of the sixteen performers working that evening were charged with "masturbation for hire" and/or "public indecency" under Georgia's state criminal code. (Id.)  No citations for violations of the Alcoholic Beverage Code were made. Likewise, no criminal charges were placed against Club Exotica or any of its operators or managers, and no action was taken to either close Club Exotica that night or to otherwise prevent its continued operation or sale of alcohol.  (Pl.'s

Response to Deft.'s Statement of Material Fact [Doc. 171] at ¶ 53).

Ten days after the raid, on August 26, 2003, Club Exotica filed another motion for a temporary restraining order in this Court [Doc. 67].  This time Club Exotica sought an order restraining the County from again disrupting the nude dancing entertainment being offered at its establishment.  The Court held an evidentiary hearing on the motion that same day.  During the hearing, the County presented the testimony of three witnesses, two Bibb County Sheriff's deputies and Sheriff Modena himself.  The two female deputies testified that they were directed to go into Club Exotica before and on the night of the raid to "observe" the conduct therein.  Once inside the club, the deputies observed nude dancers spreading their vagina open, playing with their breasts, and using their hands to separate their buttocks.  The deputies described, in graphic detail, lap dances that they and other patrons received from the performers.  According to this testimony, nude dancers would touch patrons, sit on patrons' laps, "grind" their genitals on the patrons' legs, place their vagina in the patron's face, and even use their vaginal muscles to pick up monetary tips.  One of the deputies also described seeing customers fondling the dancers and observed two dancers rubbing one another on stage.  The deputy also suspected that dancers were performing oral sex on male patrons. (Transcript, Aug. 26, 2003 [Doc. 75], at 16-59).

This testimony was only refuted by Club Exotica's witness, Michael Hutchinson, a manager on duty that evening.  Hutchinson testified that he did not personally see any the activities described by the deputies. (Id. at 80-81). Club Exotica conceded during the hearing, however, that – if the conduct described by the deputies in fact occurred – a reasonable officer could believe that violations of state law had occurred.  (Id. at 40).

Upon consideration of this testimony, the Court concluded that Club Exotica had not established a substantial likelihood of success on the merits so as to warrant the entry of injunctive relief.  (Id. at 103-04).  This Court specifically noted that it could not tell a sheriff *not* to enforce the law and explained that it would be very difficult to craft any order that would both protect Club Exotica and, at the same time, not inhibit the sheriff from enforcing the law. (Id. at 104-05).  The Court thus denied Club Exotica's motion for entry of a temporary restraining order but secured assurances from the County that no action would be taken with respect to the club's alcoholic beverage license on the basis of any expression possibly protected by the First Amendment - since those issues were still pending before the Court.  (Id. at 108).

Thereafter, on August 21, 2003, the County responded to Club Exotica's request for a continuance of the hearing on the status of its alcoholic beverage license  and notified the club that the hearing would be postponed until September of  2003.  (Doc. 104, Deft. Ex. 16).  At that time, the County further advised Club Exotica that alleged activities occurring in the club since July 23, 2003 would also be presented at the hearing ("specifically through and including August 16, 2003") and that evidence regarding the suspected state law violations and the August 16, 2003 arrests would be produced at the hearing.  (Id.).

In September, the administrative revocation hearing was conducted before the Board of Commissioners and presiding officer, Judge Taylor Phillips.  (See Transcript of Hearing before Bibb County Commissioners, September 10, 2003, Doc. 104, Deft. Ex. 9).  Therein the County presented the testimony of four witnesses: Sheriff Modena; Bibb County Sheriff's Deputy, Joseph Whitehead; Bibb County Sheriff's Lieutenant, Billy

17

Johnson; and Senior Vice President of Cornetta Enterprises (the parent company of Club Exotica), Patrick Doggrell. (See id.).

By virtue of the testimony provided, the County Commissioners heard evidence that Club Exotica's entertainers were observed providing "lap dances" for employees from at least May of 2002 through and including the night before the hearing, September 10, 2003. There was testimony that, during these dances, performers would sit on patrons' laps, gyrate, expose their breasts and genitals, and place their hands in and around their sex organs, so as to simulate masturbation. (Id. at 101-02; 105-07; 135-37). The testimony showed that the dancers received money for performing these acts with patrons and that Club Exotica managers were in a position to observe this type of conduct occurring but did nothing to stop it. (Id. at 102; 108; 116). The witnesses additionally testified that, on other occasions, there was physical contact between dancers and patrons, apparently intended to stimulate the patron sexually and that prostitution services were even offered to one undercover officer. (Id. at 106-07; 112-13; 119; 137). The County further entered a video tape into evidence, which actually depicted "lap dances" being performed at the club. (Id. at 138-141). Club Exotica had the opportunity to cross examine each witness and did so. The club was likewise given the opportunity to present evidence at the hearing but chose not to call any of their own witnesses or to present other evidence. (Id. at 143).

At the conclusion of the evidence, counsel for the County argued that the Board of Commissioners should revoke the club's current alcoholic beverage license and deny its pending application for renewal of that license because the activities of Club Exotica's dancers violated §3-71 of the Bibb County Code - which bars certain types of conduct upon

any premises licensed to sell alcoholic beverages in Bibb County.  The County asserted that: (1) Club Exotica provided alcoholic beverages at its premises under a license issued pursuant to the Alcoholic Beverage Code; (2) Club Exotica provided entertainment depicting specified body parts, as prohibited by the Alcoholic Beverage Code; (2) Club Exotica did not fall within the "mainstream performance house" exception as provided by the Code; and that (3) even if Club Exotica did fall within the mainstream exception, it nevertheless provided entertainment depicting "specified sexual activities," which would be in violation of the Alcoholic Beverage Code - notwithstanding the club's operation as a mainstream performance house. (Id. at 145-48); Code §3-71(b)(9);(b)(10); (c)(2);(c)(4).

Without articulating its reasoning or justifications, the Board of Commissioners thereafter voted[3] to revoke the alcoholic beverage license under which the club was then operating and to deny the club's pending application for renewal of that license. (Doc. 104, Deft. Ex. 9 at 162-63).  Still, no immediate action was taken to actually prevent the sale of alcoholic beverages at Club Exotica.  By agreement of the parties, Club Exotica was permitted to continue operating under its "revoked" alcoholic beverage license (and still provide totally nude entertainment), until the club exhausted its anticipated state litigation regarding the Board's decision. (See Doc. 86, p. 2:19-25).

On September 18, 2003, Club Exotica filed a petition for *writ of certiorari* with the Superior Court of Bibb County. (Doc. 104, Deft. Ex. 19).  In its petition, Club Exotica asserted that the Board's revocation and denial of the alcoholic beverage license was in

---

[3]

Four out of the four commissioners present voted to deny and non-renew; one commissioner was absent and did not vote.  (Id. at 163).  Judge Taylor Phillips did not vote on the issue.

violation of its rights as protected by the Constitution of the State of Georgia. (Id.).  A

hearing on the petition was conducted in the Superior Court of Bibb County in March of

2004, and on June 11, 2004, Superior Court Judge Martha Christian entered a written order

affirming the decision of the Bibb County Board of Commissioners and denying Club

Exotica's petition for *writ of certiorari*. (Doc. 104, Deft. Ex. 18).  Club Exotica appealed

the decision of the Superior Court by application of discretionary appeal; the Georgia Court

of Appeals subsequently denied the application for discretionary appeal on August 27,

2004. (Doc. 104, Deft. Ex. 21).

On September 14, 2004, shortly after Club Exotica's state appeal was denied (and

approximately one year after their alcoholic beverage license was actually revoked by the

Bibb County Board of Commissioners), Club Exotica was officially advised that it was no

longer permitted to sell alcoholic beverages on its premises.[4]  Bibb County Sheriff's

deputies then physically removed the club's alcoholic beverage license from its wall.

Although Club Exotica had, for all practical purposes, abandoned its remaining claims in

this Court for more than a year, the club nonetheless returned to this Court [Doc. 78]

seeking an emergency temporary restraining order, which would bar the County from taking

any action against the club or its dancers if alcoholic beverages were sold on the premises.

A hearing on Club Exotica's motion for temporary restraining order was held on

September 15, 2004. (See Transcript of Proceedings, Sept. 15, 2004, Doc. 86).  Therein,

Club Exotica contended that emergency injunctive relief was necessary because, as a night

---

[4]

The club had been permitted to sell alcohol and provide nude entertainment from July of
2003 until September of 2004.

club, it could not remain economically viable without an alcoholic beverage license.  (Id. at 9;12).  After hearing the arguments of the parties, this Court found that Club Exotica had failed to establish a likelihood of success on the merits and denied the motion.  (Id. at 14;18).  The Court agreed, however, to set a date for a hearing on Club Exotica's anticipated motion for preliminary injunction.  (Id. at 18).  Following this Court's ruling, on September 18, 2004, Club Exotica indefinitely closed its doors, finding that operation without an alcoholic beverage license was in fact not economically feasible. (See Letter, June 14, 2005 [Doc. 194]).  The club has not attempted to provide either "mainstream performances" or "adult entertainment" since that time.  (Id.)

On September 22, 2004, before Club Exotica's anticipated motion for preliminary injunction was filed, the County requested [Doc.79] that, if the Court was to entertain yet another motion for preliminary injunctive relief in this case, it be treated as a final hearing pursuant to Federal Rule of Civil Procedure 65.  In light of the prolonged history and legal nature of this case, this Court agreed that a determination on the merits of Club Exotica's claims needed to be made [Doc. 80]; a briefing schedule was set, and a hearing on the merits was scheduled for November 22, 2004.  Club Exotica thereafter objected to the Court holding a final hearing in this case [Doc. 82] and submitted a motion [Doc. 83] for leave to file a Second Amended Complaint adding new claims against the County - based on conduct taking place more than a year earlier, i.e., constitutional claims arising out of the August 16, 2003 raid and subsequent license revocation hearing.

The Court granted the club's motion to file yet another amended complaint but advised Club Exotica that it would be required to review which claims it actually intended

21

to pursue and to state each of these claims concisely so that all issues may be addressed on the merits in the preliminary injunction hearing; the Second Amended Complaint was filed October 14, 2004.  Afterwards, teleconferences with the Court were held to discuss the upcoming hearing on Club Exotica's motion for preliminary injunction. The parties ultimately agreed that Club Exotica would withdraw its motion for preliminary injunction and that an expedited discovery and dispositive motion calendar would be set.  After various extensions of discovery, brief filing deadlines, and page limitations, the present motions were filed and are now finally before the Court.

**DISCUSSION**

The cross motions for summary judgment currently at bar seek to address the legal merits of each of Club Exotica's claims. The County, of course, contends that each constitutional claim fails as a matter of law.  Club Exotica, on the other hand, counters that it is entitled to judgment as a matter of law with respect to the alleged constitutional infirmities of the County's relevant regulatory provisions and the alleged constitutionally deficient process in which its alcoholic beverage license was ultimately revoked. The Court will attempt to discuss each of Club Exotica's claims in turn below.

However, as mentioned above, Club Exotica's claims are quite broad.  To the extent that Club Exotica has failed to clearly notify this Court of its intended theories, it has done so at its own peril.  This Court has repeatedly directed Club Exotica to identify its claims in a concise and clear manner.  Still, on summary judgment, both the County and this Court

22

were forced to make great efforts to discern the relevant issues at bar.[5]  Club Exotica

appears to have repeated a continuing practice of throwing out sweeping allegations without

making the appropriate effort to flesh out arguments related thereto.  Many of Club

Exotica's claims lack clear reference to either a recognized legal theory, an applicable legal

frame work, or sufficient citation to relevant facts in support.[6]  Some grounds stated in the

Complaint have been ignored completely.

That being said, after thoroughly reviewing Club Exotica's present and final

complaint, it appears that the club essentially complains: (1) that the County's ordinances

regulating nude entertainment and the sale of alcohol are unconstitutional, (2) that it was

unconstitutionally targeted by the County for investigation and warrantless search, and (3)

that its alcoholic beverage license was thereafter unconstitutionally revoked.  These claims

are couched in terms of violations of the First, Fourth, and Fourteenth Amendments of the

United States Constitution - including both procedural and substantive due process claims

as well as alleged violations of the Equal Protection Clause. For the purposes of

simplification, this Court will first address the alleged constitutional infirmities in the

actual ordinances at issue.  The Court will next address the constitutionality of the actions

---

[5]

This Court is particularly confused with respect to any claims against Defendant John Doe.

[6]

This Court is, however, comforted by the fact that the Eleventh Circuit Court of Appeals has also found arguments by Club Exotica's present counsel lacking in clarity and factual support. See Artistic Entm't, Inc. v. City of Warner Robins, 2005 WL 1189627 n. 1 (11th Cir. 2005) (noting that plaintiff's arguments were difficult to discern); see also id. at n. 3 (attempting to decipher plaintiff's claims and noting that, to the extent certain theories were presented, plaintiff failed to identify any compelling legal or factual basis with respect thereto). Such ambiguity may therefore be intentional on the part of Club Exotica's attorneys, and this Court warns against employing such a legal strategy in the future.

of the County and its sheriff in investigating and raiding Club Exotica.  Once those issues are decided, the Court will finally address Club Exotica's claims that its constitutional rights were violated through and during the procedure in which its alcoholic beverage license was ultimately revoked.

## I.  Constitutional Challenges of the County Ordinances.

### A.  Alcoholic Beverage Code.

In its Second Amended Complaint, Club Exotica makes a litany of constitutional challenges to the County's Alcoholic Beverage Code. The club alleges that the Alcoholic Beverage Code facially violates the First Amendment of the United States Constitution because it is impermissibly overbroad and acts as an unconstitutional prior restraint on free expression. Club Exotica additionally contends that the Alcoholic Beverage Code is unconstitutionally vague (both facially and "as-applied") in violation of the Fourteenth Amendment's Due Process Clause.  On summary judgment, both parties aver that they are entitled to prevail on these claims as a matter of law.

Clearly, laws and ordinances, like the County's Alcoholic Beverage Code, are subject to facial constitutional attack under a number of different doctrines.  Recognized under the First Amendment, the overbreadth doctrine permits the facial invalidation of laws that inhibit the exercise of First Amendment rights if the impermissible application of the law is substantial when "judged in relation to the statute's plainly legitimate sweep.'" City of Chicago v. Morales, 527 U.S. 41, 52 (1999) (quoting Broadrick v. Oklahoma, 413 U.S. 601, 612-15 (1973)).  The First Amendment similarly permits facial overbreadth challenges to be posed where the ordinance creates an impermissible prior restraint on the exercise of

free speech.  See FW/PBS Inc. v. City of Dallas, 493 U.S. 215, 224 (1990).  An ordinance may further be deemed unconstitutional under the Due Process Clause of the Fourteenth Amendment, "even if an enactment does not reach a substantial amount of constitutionally protected conduct," if the ordinance is impermissibly vague - or, in other words,  "fails to establish standards for the police and the public that are sufficient to guard against the arbitrary deprivation of liberty interests." Morales, 527 U.S. at 52.  In this case, Club Exotica has chosen to attack the Alcoholic Beverage Code under all of these theories.

1.   *First Amendment - Overbreadth & Prior Restraint Claims*

As noted by the County in its motion for summary judgment, Club Exotica's First Amendment challenges in Count III of the Second Amended Complaint are "a compendium" of allegations "incorporating virtually the entire body of First Amendment Law."  This Court agrees that, from the face of Club Exotica's Complaint, it appears as though the club attempted to incorporate every possible First Amendment violation that has ever been identified in constitutional caselaw.  Significantly, however, a number of these constitutional theories seemed to have vanished on summary judgment.  As a consequence, this Court will only address those grounds specifically raised and rebutted on summary judgment; all other grounds for a First Amendment challenge to the Alcoholic Beverage Code are deemed abandoned.[7]  Resolution Trust Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir. 1995)("[T]he onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.").

---

[7]
Club Exotica did specifically move to voluntarily dismiss its First Amendment claim with respect to the licensing fee required by the ordinances. (Second Amended Compl. at ¶51(f)). The County does not object, and this request is therefore **GRANTED**.

Turning to the claims that are at bar, the Court must first acknowledge that the expressive conduct of nude dancing is in fact protected under the First Amendment of the United States Constitution. See Fly Fish, Inc. v. City of Cocoa Beach, 337 F.3d 1301, 1314 (11th Cir. 2003). Both the Supreme Court and the Eleventh Circuit Court of Appeals have recognized that, although nude dancing may only lie at the "outer perimeter of the First Amendment's protection," it nevertheless enjoys constitutional protection. Id. On summary judgment, however, the County contends that not all of Club Exotica's performances were of the type protected by the First Amendment. Relying on evidence established during the investigation of the club by the Sheriff Modena, the County avers that Club Exotica's entertainer's routinely performed "lap dances" wherein they would touch themselves and patrons in an erotic manner and that these performances went beyond that of mere nude dancing. See Baby Dolls Topless Saloons, Inc. v. City of Dallas, 395 F.3d 471, 484 (5th Cir. 2002) (quoting Hang On, Inc. v. City of Arlington, 65 F.3d 1248, 1251 (5th Cir. 1995) ("Intentional contact between a nude dancer and a patron is conduct beyond the expressive scope of the dancing itself")). The County now contends that such conduct should be characterized as "obscene" and not deemed protected by the First Amendment.

This Court is not so convinced that *all* touching done during a nude performance is intrinsically obscene - regardless of whether it involves the dancers merely touching themselves or touching a patron. Surely, some level of touching may be done in a non-obscene manner and may in fact be central to the expressive nature of the dance itself. See Deja Vu, Inc. v. Spokane County, 46 F. Supp. 2d 1083, 1090 (E.D. Wash. 1998) (stating that exotic dancers may conceivably touch themselves or others in a non-obscene manner).

26

In those instances, so-called "lap dances" and similar conduct performed by totally nude dancers may likely be protected by the First Amendment.  In this case, however, the County points to evidence that, during "lap dances," Club Exotica's dancers were actually performing oral sex on patrons, engaging in other physical contact with patrons continuing to the point of ejaculation, opening their vaginas while placing it in close proximity to the patron's face, rubbing or slapping their breast on the patron's face, grinding their genitals or buttocks on the laps of patrons, allowing patrons to use their hands and mouths to place paper money in dancers' vaginas or buttocks, and even permitting patrons to insert their fingers into dancers' vaginas. (See Deft. Statement of Material Facts [Doc. 104] ¶¶ 34, 46-47).  Surely, if nude dancing itself lies only within the "outer perimeter of the First Amendment's protections," this type of conduct falls completely outside the perimeter of the Constitution's protections all together.

The First Amendment's protections have never been treated as absolute. See Miller v. California, 413 U.S. 15, 23 (1973).  The United States Supreme Court has accordingly developed a three part guideline for determining whether sexual expression is constitutionally protected.  Id. at 25.  In Miller, the high Court determined that sexual expression would be deemed obscene and thus outside the protection of the First Amendment if: (1) the average person, applying contemporary community standards' would find that the work, taken as a whole, appeals to the prurient interests, (2) the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by . . . applicable state law, and (3) the work, taken as a whole, lack serious literary artistic, political, or scientific value.  Id. "The first and second prongs of the Miller test apply

contemporary community standards to questions of fact such as 'appeal to the prurient interest' and 'patent offensiveness.' Contemporary community standards are not applied in the third prong of the <u>Miller</u> test." <u>Penthouse Intl., Ltd. v. McAuliffe</u>, 610 F.2d 1353, 1363 (11th Cir. 1980), <u>cert. denied</u>, 447 U.S. 931 (1980). This test is also conjunctive; challenged expression must meet all three prongs before it is deemed "obscene." <u>Id.</u>

On summary judgment, Club Exotica contends that the question of whether the acts performed by its dancers were "obscene" is a question of material fact, assumably for a jury to determine.  (<u>See</u> Doc. 185 at 29-30).  In a sense, the club is correct; this is a question of fact, but it is not one requiring a jury determination.  These questions are, of course, normally presented to a jury in the criminal context, <u>see</u> <u>Pope v. Illinois</u>, 481 U.S. 497, 499 (1987); however, "a judge may act as a finder of fact in civil proceedings involving obscenity." <u>Penthouse</u>, 610 F.2d at 1363.  In a case like the one at bar, a district court judge is "entitled to draw on his own knowledge of the views of the average person in the community from which he comes for making the necessary determination in a manner similar to the 'reasonable' person test found in other areas of the law." <u>Id.</u> "The impact of the [expression at issue] is to be judged by its impact on an average person as opposed to a particularly sensitive or insensitive person."  <u>Id.</u>   Allegedly obscene material must additionally be evaluated on a case-by-case basis; an exact list of those actions deemed to be obscene would be impossible to draft and the various degrees of tolerance throughout the country would make any such list unresponsive to local needs. <u>U.S. v. Bagnell</u>, 679 F.2d 826, 836 (11th Cir. 1982).

Upon examination of the evidence presented by the County under the test set forth

in <u>Miller</u>, this Court agrees that the conduct occurring during the "lap dance" performances at Club Exotica exceeded the First Amendment's protection.  A reasonable person in this community would certainly find that Club Exotica's "lap dances" appealed to the prurient interest.  In fact, a reasonable person in this community would find that performances, which include oral copulation of spectators, physical sexual stimulation of spectators to the point of ejaculation, and actual touching of the dancer's genitals by spectators, are not only aimed at arousing an inordinate, immoderate, or unwholesome sexual desire, <u>see</u> Black's Law Dictionary 1263 (Bryan A. Garner ed., 8th ed, West 2004) (defining prurient interest), but are also "patently offensive" — especially when combined with crude acts such as spectators being allowed to place paper money in the vagina and buttocks of a dancer using only his mouth, to place his finger inside the dancer's vagina, and to have a dancer physically spread her vagina and place it in close proximity to his face.

In fact, much of the conduct described as part of the club's performances is of the type prohibited by Georgia's public indecency,[8] masturbation for hire,[9] and obscenity statutes.  <u>See</u> O.C.G.A. §§16-6-8; 16-6-16; 16-12-80. Georgia's obscenity statute specifically addresses the exhibition or other dissemination of material ("of any description") that depicts "[a]cts of sexual intercourse, . . ., normal or perverted, actual or simulated;" "[a]cts of masturbation;" and "[a]cts involving excretory functions or lewd

---

[8]

Georgia's public indecency statute prohibits any person from performing the act of sexual intercourse, lewd exposure of sexual organs, and lewd caress or indecent fondling of the body of another person in public.  O.C.G.A. §16-6-8 (West 2003).

[9]

Georgia's criminal prohibition of masturbation for hire bans the erotic stimulation of the genital organs of another by any bodily contact for money. O.C.G.A. §16-6-16 (West 2003).

exhibition of the genitals."  O.C.G.A. §16-12-80(a), (b) (West 2003).

Furthermore, having considered the "lap dance" performances as a whole, this Court cannot find any serious literary, artistic, political, or scientific value in the types of actions performed by the dancers. There may be some slight artistic value to certain parts of the dance performance, i.e., the initial body movements and rhythmic expression conveying a definite erotic message; but taken as a whole, the performances at issue were raw sexual stimulation serving no other purpose other than the sexual stimulation itself and any commercial gain derived therefrom. They had no serious literary, artistic, or political value.[10]  See Penthouse Intl., Ltd. v. Webb, 594 F. Supp. 1186, 1198 (N.D. Ga. 1984) (finding that while some portions of the magazine may have slight artistic, literary, or political value, the magazine taken as a whole has no serious literary, artistic, or political value); see also Bagnell, 679 F.2d at 836 (suggesting that expression may have no serious value when its sole intended commercial purpose is to cater to the prurient interest in sex).

To the extent that Club Exotica seeks to challenge the factual allegations posed by the County, it has failed. Club Exotica did not point this Court to any evidence rebutting the County's allegations herein. (See Doc. 185 at 29).  While such evidence may exist, it is surely not the duty of this Court to scour the record in an attempt to locate evidence which may raise a material question of fact on summary judgment. Club Exotica's general unsupported denials are clearly insufficient to raise a triable issue.  See Fed. R. Civ. P. 56(e); Celotex, 477 U.S. at 324-26.  Such denials are likewise insufficient for this Court to

---

[10] The Court's finding is obviously limited to the specific "lap dances" at issue in this case only; it is not a condemnation of "lap dances" in general.

find that the "lap dance" performances fall within the First Amendment's protections.

Even when this Court purposely looked to whether Club Exotica cited any evidence in opposition to the County's Statement of Undisputed Facts [Doc. 104], which may assist its case, this Court could only find one meager attempt by the club to rebut the County's evidence on this issue. Club Exotica merely directed this Court to "see generally" the affidavit of Patrick W. Doggrell [Doc. 169]. A review of this affidavit, however, produces no information which would assist Club Exotica. At most, Doggrell recites the general house rules for the club's dancers. (Doggrell Aff. at ¶¶ 6-7, 10-11). Doggrell does not specifically deny that any of the above discussed conduct nevertheless occurred routinely at Club Exotica, nor does Doggrell state that he was present on the nights in question so that he may competently testify as to what activities actually occurred at the club when the officers allegedly viewed this type of widespread conduct. (Id. at ¶17). Conversely, when testifying before the Board of Commissioners, Doggrell himself admitted previously seeing "lap dances," which included a dancer making actual and vigorous contact with a patron's genitals, inside Club Exotica. (Doc. 104, Deft. Ex. 9 at 87).

For these reasons, the Court must find that Club Exotica has failed to sufficiently refute the evidence on summary judgment that its "lap dance" performances consisted of conduct falling *outside* the perimeter of the First Amendment's protections. There is no contention on summary judgment, however, that these "lap dances" were the only dance performances provided by the club. The club apparently also provided stage dances. The County challenges these stage dances on the grounds that the club's nude and semi-nude dancers would often touch themselves and one another in an erotic manner during the

31

performances.  The County points to evidence that, during stage performances the dancers would often spread their legs and rub their nipples, touch their vagina and separate it with their fingers, separate their buttocks while on all fours, and even manipulate their vaginas in ways which would create noise. (See Doc. 75; Doc. 104, Deft. Ex.s 9 and 12).  The County additionally shows that stage dancers would also sometimes engage in joint dances with other performers wherein they would touch and rub against one another.  (Doc. 75 at 54).  Again, the club has not pointed to evidence refuting these allegations.

Even so, as noted above, this Court is not convinced that such erotic touching during a nude dance necessarily places the performance outside of the First Amendment's protections. While the evidence at bar makes the dances sound rather crude, this Court, on summary judgment, is unable to find that the dances are completely devoid of any artistic merit - even if such merit is slight.  Certainly, not all members of this community would define this type of expression as artistic, and many people may be offended at the sight of these performances. But, that is not sole measure for determining whether expression is protected by the First Amendment.  Here, it is undisputed that while engaging in the challenged stage activities, each of Club Exotica's performers were on stage, moving to rhythm of music, and expressing an erotic and sexual message to their audience.  The expression of eroticism and sexuality are protected by the First Amendment. See generally Barnes v. Glen Theatre, Inc., 501 U.S. 560 (1991).  Thus, so long as the stage dancers were participating in protected expression (and were not engaging in masturbation or intercourse or other actual physical stimulation of the patrons), this Court cannot, on summary

judgment, find that such dances were completely devoid of artistic merit.[11]

Yet, even to the extent that some "expression" taking place at Club Exotica did fall within the protections of the First Amendment, the County's Alcoholic Beverage Code is still not unconstitutionally overbroad.  On summary judgment, Club Exotica challenges the Alcoholic Beverage Code as being overly broad and asserts that, because the ordinance is directed towards restraining protected expression, it should be analyzed by this Court under a strict scrutiny analysis.  Bibb County's Alcoholic Beverage Code, however, does not completely bar the act of nude dancing; it merely prohibits nude entertainment on premises licensed to sell alcoholic beverages.  Moreover, in the preamble to the relevant regulation, the County indicates that the ordinance itself is not aimed at suppressing protected expression and states that the purpose of the regulation is to target the undesirable secondary effects that occur when adult entertainment is combined in locations where alcoholic beverages are served. Code at § 3-71. These findings were based "on the demonstrated experience of other urban counties and municipalities . . . ."[12] Id. The County ultimately determined that

> the prohibition of live nude conduct in establishments licensed to serve
> alcohol for consumption on the premises is in the public welfare by
> furthering legitimate government interests, such as reducing criminal
> activity, protection against property devaluation and deterioration, and
> eliminating undesirable community conditions normally associated with
> establishments which serve alcohol and/or encourage nudity, and that such

---

[11] This argument may, however, be renewed at a later date.

[12]

Club Exotica apparently does not seek to challenge the County's initial reliance on the experiences of these other municipalities.  In its brief, the club states, "Whether, in 1993, the County intended to harm adult entertainment establishments by adopting a comprehensive licensing and zoning ordinance is not questioned here." (See Doc. 107 at 18-19).

prohibition will not infringe upon the protected constitutional rights of freedom of speech.

Id.

In this Circuit, it has long been settled that such ordinances are in fact content-neutral and subject to the analysis announced in United States v. O'Brien, 391 U.S. 361 (1968). See Artistic Entm't, Inc. v. City of Warner Robins, 223 F.3d 1306, 1309 (11th Cir. 2000) (herein "Artistic I."); Sammy's of Mobile, Ltd. v. City of Mobile, 140 F.3d 993, 996 (11th Cir. 1998); Flanigan's Enters., Inc. v. Fulton County, 242 F.3d 976, 983-84 (11th Cir. 2001). "Under O'Brien, . . . content-neutral restrictions on speech are valid if the government can show a reasonable basis for believing its policy will indeed further a substantial government interest and that the policy is the least restriction possible which would further that interest." Artistic Entm't, Inc. v. City of Warner Robins, 331 F.3d 1196, 1205 (11th Cir. 2003) (herein "Artistic II."). In other words, "[u]nder this test, an ordinance is constitutional if: (1) the interest served is within the power of the government; (2) the regulation furthers that interest; (3) the interest served is unrelated to free expression; and (4) there is no less restrictive alternatives." Sammy's, 140 F.3d at 996.

Clearly, when applied to the present ordinance, the O'Brien test is satisfied. The County's restriction of nude entertainment in venues licensed to sell alcoholic beverages is certainly within the ambit of the power of the state under both the Twenty-First Amendment and general police power of the state. Additionally, like the ordinance examined in Sammy's, the Alcoholic Beverage Code's "statement of purpose and findings as to the problems created by the combination of alcohol and nude entertainment are sufficient to support the requirement that the regulation further [a substantial state]

34

interest."  See Sammy's, 140 F.3d at 996-97.  "The avoidance of criminal activity, protection of property values, and avoidance of community blight are undeniably important."  Flanigan's, 242 F.3d at 985.  This interest served is further "unrelated to the suppression of free expression and the ordinance is narrowly tailored to the perceived problem;" the mere requirement that performers partially cover their breast, buttocks, and genitals at venues where alcohol is sold "is certainly the least restriction possible which would still further the [County's] interest in controlling the combustible mixture of alcohol and nudity." Sammy's, 140 F.3d at 997.

As the Eleventh Circuit Court of Appeals announced in Sammy's, ordinances similar to the one crafted by Bibb County "do[] not seek to ban bars or nude dancing. Everyone can still buy a drink and watch nude dancing . . . .  They cannot, however, do both in the same place." Id. at 999.  This is constitutional; like the Eleventh Circuit, this Court is "unaware of any constitutional right to drink while watching nude dancing." Id.

On summary judgment, however, Club Exotica's challenge to the Alcoholic Beverage Code is not necessarily directed to the ordinance's initial form as enacted in 1993. In its motion for partial summary judgment, Club Exotica primarily argues that the County's May 2002 amendment to the Alcoholic Beverage Code (which clarifies the "mainstream performance house exception") is unconstitutional because the County did not entertain new evidence when the amendments were passed but merely "alluded to 'studies' which were tendered nearly ten years earlier."  In its brief, Club Exotica states that it is challenging "the propriety of justifying the 2002 legislation by posthumously tendering out-of-state zoning studies and anecdotal testimony."  The club similarly argues that the timing

of the amendments suggest that the intent of the County Commissioners was in fact not to deter negative secondary effects but was to impinge on the exercise of Club Exotica's First Amendment rights to provide nude entertainment.

The Court finds all of these arguments unpersuasive; the Eleventh Circuit previously rejected similar arguments in its <u>Artistic Entertainment</u> line of opinions. The circuit court has specifically held that consideration of the type of evidence relied upon by the County when passing its 1993 ordinance was adequate, noting that "[t]he government need only have a 'reasonable basis' . . . for believing that its policy will indeed further a legitimate interest." <u>Artistic I</u>, 223 F.3d at 1309.  As such, "'the experience of other cities, studies done in other cities, caselaw finding on the issue, as well as [the official's] own wisdom and common sense' [is] sufficient."  <u>Id.</u> (quoting <u>Sammy's</u>, 140 F.3d at 997).  In <u>Artistic II</u>, the circuit court further addressed the question whether a municipality could rely on its original evidentiary support in passing a subsequent amendment to an ordinance restricting nude dancing. 331 F.3d at 1205.  The Eleventh Circuit held that reliance on such evidence was in fact sufficient and rejected the contention that additional evidence needed to be considered when making a slight adjustment to an otherwise validly enacted ordinance.  <u>Id.</u>  The Eleventh Circuit has also reminded courts to be "hesitant to inquire into legislators' motives" in these situations and indicated that courts should "not strike down an otherwise constitutional statute on the basis of an alleged legislative illicit motive." <u>Artistic I</u>, 223 F.3d at 1309.

Thus, where, as here, there is no challenge to the studies and findings used to support the initial passage of a valid ordinance prohibiting nude dancing and the sale of

alcohol at the same venue, this Court will not say that subsequent adjustments to that ordinance must be supported by any evidence more substantial than that originally believed to be sufficient for the initial enactment [13] – especially when such amendments are designed to correct possible constitutional infirmities in the ordinance itself.[14] See Artistic II, 331 F.3d at 1205.  Nor will this Court delve into the alleged illicit motives of the County Commissioners when an ordinance and its amendments are validly supported on its face. See Artistic I, 223 F.3d at 1309.  To this extent, the Court finds that Club Exotica's First Amendment overbreadth challenges to the Alcoholic Beverage Code are without merit; in this respect, summary judgment is due to be **GRANTED** in favor of the County.

However, Club Exotica also makes a facial challenge to the Alcoholic Beverage Code under a prior restraint theory. Club Exotica's argument is that the Alcoholic Beverage Code acts as an unconstitutional prior restraint on free expression because it fails to guarantee "prompt judicial review" of a license denial or revocation.  (See Brief in Support of Motion for Partial Summary Judgment [Doc. 107] at 21).  The United States Supreme Court has held that an unconstitutional prior restraint can exist where there is no avenue for

---

[13]

Certainly, "the County cannot rely on 'shoddy data or reasoning . . .'" and "plaintiffs must be given the opportunity to 'cast direct doubt on this rationale' with evidence of their own.'" Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee County, 337 F.3d 1251, 1269 (11th Cir. 2003).  Here, however, Club Exotica has failed to properly come forward with or specify any evidence which may "cast direct doubt" on the County's rationale for enacting either the original ordinance or the amendments thereto.  In its briefs, the club only makes unsupported allegations that the studies did not support the County's proffered rationale.

[14]

In this case, when making the relevant amendments, the County pronounced that since the initial ordinance was passed, the "law governing such regulations . . . has evolved to the point that it is now necessary for Bibb County to amend its regulations to insure that they comport in all respects to the law." (See Doc. 51, Ex. A).

an "expeditious judicial review" of a decision denying or revoking a license which affects the free exercise of protected expression.  See FW/PBS, 493 U.S. at 227-28 (citing Freedman v. Maryland, 380 U.S. 51, 58-60 (1965)).

Even so, the cases finding such a prior restraint in the nude dancing context are materially distinguishable from the case at hand.  In those relevant cases, the ordinance at issue was one solely regulating the licensing and/or zoning of adult businesses.  See e.g., Artistic I, 223 F.3d at 1310 (holding that city adult business ordinance lacked procedural safeguards for applicants and was thus an unconstitutional prior restraint on expression); Fly Fish, Inc. v. City of Coco Beach, 337 F.3d 1301, 1313-14 (11th Cir. 2003) (holding adult entertainment licensing provision to be unconstitutional prior restraint where ordinance failed to impose time limits in which city had to act on application); Redner v. Dean, 29 F.3d 1495, 1502 (11th Cir. 1994) (holding that adult entertainment licensing scheme was a unconstitutional prior restraint failing to provide for prompt judicial review of a decision to deny the license); Deja Vu of Nashville, Inc. v. Metro. Govt. of Nashville, 274 F.3d 377, 401-03 (6th Cir. 2001) (holding that the lack of a judicial review provision in an adult entertainment licensing ordinance rendered the ordinance an unconstitutional prior restraint on free expression). The rationale in these cases was that a delay in licensing or an absence of a prompt judicial review following the denial thereof would indefinitely bar an applicant from engaging in protected expression.  See FW/PBS, 493 U.S. at 226 (stating that "a licensing scheme creates the possibility that constitutionally protected speech will be suppressed where there are inadequate procedural safeguards to ensure prompt issuance of the license"). By its very definition, a prior restraint "exists when the

38

exercise of a First Amendment right *depends* on the prior approval of public officials." Deja Vu, 274 F.3d at 400 (emphasis added).

That circumstance is not present here.  Delay in the issuance of Club Exotica's alcoholic beverage license or a lack of prompt judicial review following the denial or revocation thereof would not preclude Club Exotica from engaging in protected expression.[15]  It would only prevent Club Exotica from providing or selling alcoholic beverages in the interim.  Inasmuch, Club Exotica has failed to establish how the Alcoholic Beverage Code would somehow act as a prior restraint on its exercise of protected expression even if the Code failed to provide for a prompt judicial review of a alcoholic beverage license revocation or denial. Again, there is no recognized First Amendment right to serve alcoholic beverages while providing nude entertainment.  See Sammy's, 140 F.3d at 999.  For this reason, the Court finds that summary judgment is likewise due to be **GRANTED** in favor of the County as to Club Exotica's First Amendment facial prior restraint claim.

2.    *Due Process - Vagueness Claims*

Club Exotica also contends that the Alcoholic Beverage Code violates its substantive Due Process rights, as guaranteed by the Fourteenth Amendment of the U.S. Constitution.  Club Exotica is assumably making this claim based on the fact that nude dancing is conduct which implicates a liberty interest protected by the Due Process Clause.

---

[15]

To the extent that the club would want to provide adult entertainment, it would of course have to comply with the Adult Entertainment Licensing Code, but if it merely wanted to operate as a mainstream performance house, no licensing requirement would apply under the Bibb County scheme.

See Geaneas v. Willets, 911 F.2d 579, 586 (11th Cir. 1990) (mentioning that if nude dancing implicates a liberty interest under the Fourteenth Amendment it would be entitled to similar protection as provided by the First Amendment). But, as with the First Amendment claims discussed above, even if Club Exotica had a protected liberty interest in being able to provide its nude stage dance performances, the Alcoholic Beverage Code is not impermissibly vague in violation of Due Process.

Here, Club Exotica contends that the County's Alcoholic Beverage Code, specifically the "mainstream performance exception," is  unconstitutionally vague - both facially and as applied to Club Exotica.  It is, of course, "a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." Grayned v. City of Rockford, 408 U.S. 104, 108 (1972).   An ordinance "fails to meet the requirements of the Due Process Clause if it is so vague and standardless that it leaves the public uncertain as to the conduct it prohibits" or otherwise lacks minimal guidelines to govern the ordinance's enforcement — such that it may "authorize or even encourage arbitrary and discriminatory enforcement." Morales, 527 U.S. at 56.  The rationale for this doctrine is quite logical:

> First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. Third, vague laws may tend to chill the exercise of constitutionally protected conduct.

Geaneas, 715 F. Supp. at 338 (quoting Grayned, 408 U.S. at 108-109).

a.      Facial Claims

Here, Club Exotica first contends that the "mainstream performance exception" included in the Alcoholic Beverage Code is unconstitutionally vague on its face. "A facial challenge, as distinguished from an as-applied challenge, seeks to invalidate [an ordinance] itself."  Horton v. City of St. Augustine, 272 F.3d 1318, 1329 (11th Cir. 2001).  Success in a facial challenge in this situation is difficult, however.  "The general rule is that for [such a] challenge . . . to succeed, 'the challenger must establish that no set of circumstances exist under which the [ordinance] would be valid.'" Horton, 272 F.3d at 1329 (quoting U.S. v. Salerno, 481 U.S. 739, 745 (1987)). "'The fact that [an ordinance] might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid.' This 'heavy burden' makes such an attack 'the most difficult challenge to mount successfully' against enactment.'"  Id.

In this case, the Alcoholic Beverage Code provides that its prohibition against the display of "specified anatomical areas" in venues licensed to sell alcoholic beverages shall not apply to

> any traditional or live performance house, museum, theater, concert hall, opera house, educational institution *or similar establishment*, which regularly features legitimate live performances, including plays, operas, ballets, concerts or other similar performances, and which derives less than 20 percent of its gross annual revenue from the sale of alcoholic beverages.

As amended on May 24, 2002, this exception then further clarifies that

> It is the intent of this section to require that any establishment seeking to qualify as a traditional theater must first meet the definition of traditional or live theater (mainstream performance house), as defined in [Adult Entertainment Code, Bibb County, Ga., Code § 6-72(15)] and secondly derive less than 20 percent of its gross annual revenue from the sale of alcoholic beverages.

41

On summary judgment, Club Exotica challenges the phrase "*or similar establishment*" as used in the "mainstream performance exception." The club contends that this phrasing makes the entire provision unconstitutionally vague because it improperly requires applicants and county officials to "weigh subjective criteria in determining whether an establishment is 'similar to' a 'live performance house, museum, theater, concert hall, [or] opera house.'" (See Doc. 107 at 4). The Court finds this argument unpersuasive.

Obviously, the first part of the mainstream performance exception is designed to be broad and apply to various types of venues: "any traditional or live performance house, museum, theater, concert hall, opera house, educational institution *or similar establishment*." This provision alone may in fact suffer from some ambiguity in that an applicant or official would have to subjectively determine whether a venue seeking protection under the exception is sufficiently "similar" to "a live performance house, museum, theater, concert hall, opera house, [or] educational institution." Even so, the Court does not find that this ambiguity would render the ordinance unconstitutional. The ordinance plainly lists a variety of different venues in an attempt to define those establishments covered and is open-ended only in an attempt to be inclusive of those infinite types of venues that may also fall under the exception. The examples included in the ordinance are regularly used in common parlance and are such that a reasonable person would understand their meaning. And, certainly, some circumstances do exist under which the ordinance would not be unconstitutionally vague - i.e., when a community theater produces plays such as *Hair* (which contains scenes of frontal nudity) and additionally sells alcoholic beverages during intermission.

42

Moreover, any ambiguity in this language was cured by the County as part of the May 24, 2002 amendment.[16] By incorporating the language used in the Adult Entertainment Licensing Code, the County effectively provided a clearer definition of establishments intended to be covered by the exception, i.e., establishments that:

> regularly feature[] live performances, including plays, operas, ballets, concerts or other similar performances, which are not distinguished or characterized by an emphasis on the depiction, display, or description, or the featuring of "specified anatomical areas" or "specified sexual activity" in that such depiction, display, description or featuring is incidental to the primary purpose of any performance. Performances and showings are regularly featured when they comprise 85 percent of all performances or showings. "Distinguished or characterized by an emphasis upon" means the dominant or principal theme of the object referenced.  For instance, when the phrase refers to performances, which are "distinguished or characterized by an emphasis upon the exhibition or display of specified anatomical areas," the performances so described are those whose dominant or principal character or theme is the exhibition or display or "specified anatomical areas" or "specified sexual activities."

This more specific definition undeniably gives a business owner or county official finite and objective criteria for determining which types of venues are intended to be covered.  Plainly stated, an establishment may be covered under this section if the depiction or display  of "specified anatomical areas" is not the dominant or principal theme of more than 15% of the performances offered.  To require more specificity from a statute is not realistic.  The County was simply "[c]ondemned by the use of words" when drafting this ordinance, and "we can never expect mathematical certainty from our language." Grayned,

---

[16]

To the extent that Club Exotica is seeking to challenge only the pre-May 2002 form of the ordinance, this Court finds that claim to have been mooted by the amendment itself. Moreover, it is clear from the fact of this case that Club Exotica did not actually attempt nude "mainstream performances" until July of 2003 - well after the May 2002 amendment was in place.  The 2002 form would thus be most appropriately applied to the present case.

408 U.S. at 111.  On summary judgment, Club Exotica is simply asking for "a precision of vocabulary that is both impossible and unnecessary." Compare Artistic I, 223 F.3d at 1310.

        The remaining requirement of the mainstream performance exception is likewise objective.  As shown above, the second prong of the exception provides an establishment would be covered if the venue derives less than 20% of its gross revenue from the sale of alcohol.  This "80/20" gross revenue standard is concrete and not vague on its face.  In fact, the inclusion of an objective percentile requirement actually "limits the opportunity for arbitrary and discriminatory enforcement of the . . . ordinance by establishing objective criteria." See Artistic I, 223 F.3d at 1310.  Moreover, in this case, the County even went one step further by providing additional clarification as to what revenue may *not* be excluded from alcohol revenues; it specifies that "[i]f the cost of admission to the establishment, whether by cover charges or tickets, entitles the patrons to free drinks(s), then the revenue generated by the ticket sale or cover charge is to be included in the annual revenue from the sale of alcoholic beverages."

        Yet, on summary judgment, Club Exotica contends that the objective percentile requirements in the mainstream definition and exception are nevertheless vague because the ordinance does not provide for a time frame over which each calculation should be made.  This argument was essentially rejected by the Eleventh Circuit in Artistic I.  223 F.3d at 1310.  Upon consideration of a similar percentile requirement, the circuit court concluded that while "[t]he ordinance leaves the city some flexibility in measuring whether a venue falls under the 'mainstream theater' exemption, . . . we are satisfied that the exemption's '80/20' standard provides adequate notice to business operators and an

adequate restraint on arbitrary enforcement." Id. (citing Mason v. Florida Bar, 208 F.3d 952, 959 (11th Cir. 2000)).

Of course, in Artistic I, the Eleventh Circuit was addressing an "80/20" standard applying to the number of performances with an emphasis on nudity and not an "80/20" standard based on the gross revenues attributable to alcohol sales.  Even so, this Court finds that the same reasoning also applies to the County's "80/20" standard with respect to the sale of alcohol.  In fact, the gross revenue "80/20" standard used in this case is actually less arbitrary than the standard examined in Artistic I because revenue is more easily subjected to a concrete mathematical computation than the content of artistic performances. Moreover, in this case, the "80/20" standard *is* given a relevant time frame, as it specifies that no more than 20% of the club's *annual* income can be derived from the sale of alcohol. The Court finds, therefore, that even though the objective "80/20" percentile measurement may give the County some flexibility in measuring  a venue's gross income, it is nonetheless sufficient to give adequate notice to business operators and provide an adequate restraint on arbitrary enforcement by the County.

Still, Club Exotica further contends that the percentile requirements in the "mainstream performance exception" are unconstitutionally vague because the ordinance requires the applicant to first demonstrate that its performances will not "emphasize the display of anatomical areas" or "specified sexual activity" before an applicant can qualify under the exception. (Doc. 107 at 5). Club Exotica complains that such a requirement is unconstitutional because applicants and officials cannot "gauge whether nude dancing is acceptable until the establishment has first offered the nude dance entertainment," and as

such, "[i]t is quite possible that the establishment must violate the code before it learns that it is subject to punishment."  (Id.).  In making this facial challenge, Club Exotica relies upon the Supreme Court case of City of Chicago v. Morales, 527 U.S. 41, 52 (1999).

In Morales, the United States Supreme Court found an ordinance banning gang members from loitering in public places to be unconstitutionally vague on its face.  527 U.S. at 45-47.  Loitering, as used in that ordinance was defined as "to remain in any one place with no apparent purpose." Id. at 47 n.2.  The Court found this ordinance to be vague "in the sense that no standard of conduct is specified at all" and it "fail[ed] to give the ordinary citizen adequate notice of what is forbidden and what is permitted." Id. at 60.  The ordinance thus provided law enforcement officers with unbridled discretion to determine whether loiterers had "no apparent purpose" in violation of the ordinance.  See id. at 61-62.

Here, Club Exotica specifically relies on the following statement by the Supreme Court in Morales:

> Because an officer may issue an order only after prohibited conduct has already occurred, [the ordinance] cannot provide the kind of advance notice that will protect the putative loiterer from being ordered to disburse.  Such an order cannot retroactively give adequate warning of the boundary between the permissible and impermissible applications of the law.

Id. at 59.  Yet, to rely on this statement alone is to overlook the full rationale of the Court in Morales.  The vagueness found to permeate the ordinance in Morales does *not* exist in the County's Alcoholic Beverage Code's  "mainstream performance exception."  As discussed above,  the County has, through the ordinance itself, sufficiently identified those types of venues and performances intended to be covered by the exception.  Accordingly, unlike Morales' description of loitering, the ordinance at issue here gives adequate notice

46

of what types of nude performances are permitted under the Alcoholic Beverage Code.  A business owner or county official would, therefore, be readily able to determine whether the performances at a given location are permissible on premises licensed to sell alcohol *before* such performances actually take place.

Moreover, the County's mainstream performance exception does not encourage arbitrary enforcement by law enforcement officers as the ordinance in Morales did.  In drafting the exception, the County included two very specific percentile measurements for determining whether the types of performances and ratio of alcohol revenues complied with the terms of the exception.  Again, while these percentage measures leave room for some flexibility in application, they are nonetheless sufficient "to provide[] adequate notice to business operators and an adequate restraint on arbitrary enforcement."  See Artistic I, 223 F.3d at 1310.  Thus, despite the seemingly applicable language from Morales cited by Club Exotica, this Court finds that, under the analysis actually used in Morales, the County's "mainstream performance exception" may not be deemed unconstitutionally vague on its face.  See generally, Horton, 272 F.3d at 1330-31 (making a similar distinction from the ordinance examined in Morales).  For these reasons, Club Exotica's facial vagueness challenges fail as a matter of law, and summary judgment is due to be **GRANTED** in favor of the County with respect to this claim.

b.      "As-applied" Claims

Finally, Club Exotica contends that the County's "mainstream performance exception" is unconstitutionally vague as applied to its operations. On summary judgment, however, neither party attempts to discuss the relevant standard for determining the validity

47

of an "as-applied" claim.  Rather, the parties appear to merely repeat the issues considered as part of Club Exotica's facial challenge to the "mainstream performance exception" (discussed above).  Club Exotica adds only that a question of fact remains as to whether the club actually derived less than 20% of its annual gross revenue from the sale of alcoholic beverages and that Sheriff Modena himself is apparently unaware of how the "mainstream performance exception" should be applied to Club Exotica.

First of all, the Court notes that Club Exotica has failed to point this Court to any evidence supporting its claim that it actually derived less than 20% of its annual gross revenue from the sale of alcoholic beverages; thus, no "question of fact" can exist.  Furthermore, even if there were a triable question of fact as to whether Club Exotica derived less than 20% of its annual gross revenue from the sale of alcoholic beverages, there is no evidence before the Court that the "80/20" standard was ever applied to Club Exotica's operations.  During the September 2004 revocation hearing before the county commissioners, all evidence presented by the County addressed alleged conduct taking place on the club's premises.  County commissioners heard evidence that dancers openly gyrated, exposed their breasts and genitals, and placed their hands in and around their sex organs - so as to simulate masturbation.  Witnesses additionally testified that, on other occasions, there was physical contact between dancers and patrons and that dancers would often "grind" their genitals on customer's laps and legs (apparently with the intent to stimulate the patron sexually). No evidence was presented about the percentage of the club's annual gross revenues attributable to alcohol sales.  As such, at the close of evidence, the County attorney recommended that the club's license be revoked - not based on its

excessive alcohol revenue but based on the alleged conduct of its dancers.[17]

Significantly, the "mainstream performance exception" only provides an exclusion from the Code's prohibition against the display of "specified anatomical areas." "Specified sexual activities," however, are barred in <u>all</u> venues licensed to sell alcohol - regardless of whether the venue falls within the scope of the "mainstream performance exception." The prohibition against the performance of "specified sexual activities" unambiguously forbids things such as: "the fondling or other erotic touching of human genitals . . . or female breast," "sex acts . . ., actual or simulated . . .," and "masturbation, actual or simulated." These, of course, are the exact same types acts of which Club Exotica's dancers were accused of committing, and by virtue of the plain language of the ordinance itself, Club Exotica had clear notice that this type of conduct was prohibited on <u>all</u> premises licensed to sell alcoholic beverages. Upon hearing the relevant testimony and video surveillance presented, the Board of Commissioners apparently concluded that the evidence before it was sufficient to find a violation of §3-71(c) of the Alcoholic Beverage Code.[18]  There is nothing, therefore, to show that the Code was somehow vague "as-applied" to Club Exotica's operations.  <u>Compare</u> <u>Joel v. City of Orlando</u>, 232 F.3d 1353, 1360 (11th Cir. 2000) (rejecting as-applied vagueness claim where conduct fell squarely within the

---

[17]

To the knowledge of this Court, the only challenges that the County has formally made to the club's alcohol-related revenues are included in the presented litigation and not in the actual application of the ordinance to Club Exotica.

[18]

The Court is not to re-weigh the evidence before the County Commissioners and determine whether or not it was credible. At this juncture, the Court is only to determine whether there was an unconstitutional vagueness in the application of the ordinance when the club's alcoholic beverage license was ultimately revoked/denied.

ordinance's unambiguous prohibitions).

To the extent that Sheriff Modena and his deputies were allegedly unaware or could disagree as to how the "mainstream performance exception" should be applied, there is no evidence that these law enforcement officers ever actually applied the Alcoholic Beverage Code to the operations of Club Exotica. Neither §3-71(c) nor the "mainstream performance exception" were mentioned in Modena's July 2003 letter recommending the revocation and denial of Club Exotica's alcoholic beverage license.  Sheriff Modena additionally testified that, when recommending that the club's license be revoked and pending application denied, he did not apply any standard contemplated by §3-71(c).  Rather, Modena waited until he and his deputies had determined that there were ongoing violations of state law and believed that, once state law was violated, the County's ordinance was moot. (See Transcript of Hearing, September 10, 2003, Doc. 104, Deft. Ex. 9 at 50) (". . . the charges that we made, the mainstream theater didn't really enter into it because it was violations of state law."); Transcript of Hearing, Aug. 26, 2003 [Doc. 75], at 62-63 ("state law prevailed over the county ordinance")).

The Eleventh Circuit has also previously rejected a similar argument that ordinances, which may be subject to varying interpretations by law enforcement, are *per se* unconstitutionally vague as-applied.  See Joel, 232 F.3d at 1361.  As the circuit court noted,

> there are limitations in the English language with respect to being both specific and manageably brief, and it seems to us that although the prohibitions may not satisfy those intent on finding fault at any cost, they are set out in terms that the ordinary person exercising ordinary common sense can sufficiently understand and comply with, without sacrifice to the public interest.

50

Id. (quoting United States Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers, 413 U.S. 548, 578-79 (1973)).  Applying this rationale, the court concluded that although the ordinance at issue may not have defined the relevant terms as precisely as the plaintiff would have wished, such failure is "of no constitutional moment." Id.

Similarly, in this case, as found above, the challenged language included in §3-71(c) of the Alcoholic Beverage Code is sufficiently clear to provide notice to business owners and county officials alike as to what conduct is permitted and prohibited on premises licensed to sell alcohol.  Thus, the fact that the language is not as precise as Club Exotica would have desired and is possibly subject to slightly varying interpretations by law enforcement officers is "of no constitutional moment."  The Court finds, therefore, that Club Exotica's "as-applied" challenges to the mainstream performance exception also fail as a matter of law and that, for all the reasons discussed above, summary judgment should be **GRANTED** in favor of the County with respect to Club Exotica's "as-applied" constitutional challenges to the Alcoholic Beverage Code.

B.  Adult Entertainment Licensing Code.

Club Exotica's Second Amended Complaint also includes numerous constitutional challenges to the County's Adult Entertainment Licensing Code.  The Court notes, however, that Club Exotica makes these challenges even though the club does not claim (and has not ever claimed) to provide "adult entertainment" at its venue. Club Exotica has never attempted to apply for an adult entertainment license; nor has the Adult Entertainment Licensing Code ever been used to threaten or prevent nude entertainment at

Club Exotica.[19]   Obviously, it was the Alcoholic Beverage Code and not the Adult Entertainment Licensing Code that was relied upon to revoke Club Exotica's alcoholic beverage license.  This is because, at all times during this litigation, Club Exotica has maintained that it should be permitted to operate under the Alcoholic Beverage Code's "mainstream performance exception."  Historically, the club has stated that it "is not trying to offer adult entertainment" and argued that the County's licensing procedure for adult entertainment businesses does not apply to Club Exotica's operations. (See Order, July 14, 2003 [Doc. 65] at 3 n.1.).

A review of the prolonged history of this case indeed makes it obvious that Club Exotica's single goal is to provide nude entertainment and simultaneously sell alcoholic beverages on its premises; its goal is not to simply operate as an "adult entertainment" venue.  This is demonstrated most clearly by the fact that Club Exotica chose to indefinitely close its doors on September 18, 2004 after its alcoholic beverage license was finally revoked and that it has further indicated an unwillingness to re-open unless its alcoholic beverage license is reinstated. (See Doc. 194).  It is significant, therefore, that under the Adult Entertainment Licensing Code, the purveyance of "adult entertainment" would not be permitted in any venue licensed to sell alcoholic beverages in Bibb County.  See Code §6-73(d).  Such prohibitions have been repeatedly upheld in this Circuit when the

---

[19]

During a hearing before this Court, Club Exotica explained that it had included challenges to the Adult Entertainment Licensing Code in its complaint in anticipation that the County would "probably try to enforce other parts of the [Bibb County] Code to stop Club Exotica from offering nude entertainment." (Transcript, Sept. 15, 2004 [Doc. 86] at 5).  There is no evidence that the Adult Entertainment Licensing Code has been used by the County to prevent nude entertainment at Club Exotica or that Club Exotica ever intended to operate as an adult entertainment establishment.

ordinances are enacted to combat negative secondary effects, which occur when alcohol sales are combined in locations providing nude and adult entertainment. See Artistic I, 223 F.3d at 1309. For the same reasons discussed with respect to the Alcoholic Beverage Code (part I.A.1. *supra*), the Adult Entertainment Licensing Code's prohibition on the provision of adult entertainment on the premises of any venue licensed to sell alcoholic beverages would be upheld as constitutional. The preamble of the two ordinances are virtually identical, and the two provisions are actually cross referenced in the Code. Code § 6-71.

As such, it is not clear that Club Exotica may properly pursue constitutional claims based on the Adult Entertainment Licensing Code — an ordinance under which it does not seek to operate and that has not been enforced against it. See Digital Props., Inc. v. City of Plantation, 121 F.3d 586, 589 (11th Cir. 1997) ("The ripeness doctrine protects federal courts from engaging in speculation or wasting their resources through the review of potential or abstract disputes."); see also FW/PBS, 493 U.S. at 224 ("[T]he party who seeks the exercise of jurisdiction in his favor [bears the burden to] clearly allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute."). Nor does it seem that discussion of that ordinance would be materially relevant to the instant case; any constitutional infirmities found in the Adult Entertainment Licensing Code would have no effect on or benefit to Club Exotica since the club does not (and apparently does not intend to) operate under the Adult Entertainment Licensing Code. See Church of Scientology of Ca. v. United States, 506 U.S. 9, 12 (1992) ("It has long been settled that a federal court has no authority 'to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue

53

in the case before it.'"). Most importantly, in light of the Court's above findings with respect to the Alcoholic Beverage Code, a ruling invalidating the entire Adult Entertainment Licensing Code would still not permit Club Exotica to do what it ultimately wishes to do - provide nude entertainment *and* maintain a license to sell alcoholic beverages on its premises. The Court finds, therefore, that any claims by Club Exotica based upon the County's Adult Entertainment Licensing Code need not be addressed herein and that such claims should be **DISMISSED** without prejudice.

II.     **Constitutional Challenges to the Actions of the County and its Sheriff in Investigating and Raiding Club Exotica**.

        The Court now turns to the second category of claims asserted by Club Exotica in its Second Amended Complaint. Club Exotica generally claims that the County, by and through the actions of Defendant Sheriff Modena, (1) unconstitutionally targeted Club Exotica for investigation based upon an animosity towards nude dance entertainment and with the intent to chill the protected expression of its dancers; (2) treated Club Exotica differently than similarly situated businesses; and (3) conducted an unconstitutional warrantless raid of the club's premises on August 24, 2003. Again, these claims are couched in terms of violations of the First, Fourth, and Fourteenth Amendments. And, as with Club Exotica's First Amendment challenges above, the Court notes that a number of grounds asserted in the Second Amended Complaint (with respect to alleged unconstitutional conduct by the County during and through the investigation and revocation) are not asserted on summary judgment; any such grounds will be deemed abandoned as a matter of law. See Resolution Trust, 43 F.3d at 599.

54

A. <u>Fourteenth Amendment Claims</u>.

With respect to its claims under the Fourteenth Amendment, Club Exotica contends that it was unconstitutionally subjected to selective enforcement of the Alcoholic Beverage Code and that the Sheriff's Office unconstitutionally "piled-on" ordinance violations to make a case for license revocation. As a necessary prerequisite to addressing the merits of these claims, this Court must address the significance of Judge Martha's Christian's previous rulings following Club Exotica's September 2003 petition for *writ of certiorari* to the Superior Court of Bibb County. On summary judgment, the County contends that all claims previously addressed by the Bibb County Superior Court are barred from being raised in this suit by virtue of the doctrine of *res judicata*. In making this argument on summary judgment, the County relies on an order from the Northern District of Georgia, <u>Mega v. Byrne</u>, 2001 WL 1094904 (N.D. Ga. August 16, 2001), <u>aff'd</u> 31 Fed. Appx. 942 (11th Cir. Jan. 28, 2002). Although this order is not mandatory authority, this Court finds the Northern District's reasoning to be quite instructive and persuasive.

In <u>Byrne</u>, the plaintiff had filed a federal claim asserting that the Cobb County Board of Commissioners' revocation of his liquor license violated his rights as guaranteed by the Fourteenth Amendment of the United States Constitution. <u>Id.</u> Prior to filing his suit in federal court, the plaintiff had been afforded a full hearing before the Cobb County Board of Commissioners, wherein the denial of his application was upheld. <u>Id.</u> Thereafter, the plaintiff filed a petition for *writ of certiorari* in the Superior Court of Cobb County, and a hearing was held before the Superior Court shortly thereafter. <u>Id.</u> The plaintiff was represented by counsel but did not present any federal claim in its petition to the Superior

Court. Id. Following the hearing, the plaintiff's petition was denied. Id. He then appealed to the Georgia Court of Appeals. Id. On appeal, the plaintiff was again represented by counsel but did not present any federal equal protection claim. Id. After receiving adverse rulings from both state courts, the plaintiff finally filed the suit in federal court and, for the first time, alleged a federal equal protection claim. Id.

The sole issue before the Northern District in Byrne was whether the plaintiff's federal claims were barred by the doctrine of *res judicata*. Id. "Under *res judicata*, a final judgment on the merits of an action precludes the parties . . . from litigating issues that were or could have been raised in that action." Id. (quoting Kremer v. Chemical Constr. Co., 456 U.S. 461, 467 n.6 (1982) (emphasis added)). Thus, in Byrne, the defendants contended that *res judicata* barred the plaintiff's federal constitutional claim because the plaintiff could have raised this claim before the Superior Court of Cobb County and the Georgia Court of Appeals but chose not to. Id. Upon consideration of the issue, the district court agreed finding that the Cobb County Superior Court was a court of competent jurisdiction, that the plaintiff had a full and fair opportunity to litigate his federal claims at the state level, and that the plaintiff did not attempt on the record to reserve any federal constitutional claims in hopes of preserving access to a federal forum. The court accordingly ruled that the plaintiff had waived any right to federal judicial review of these federal issues. Id. Summary judgment was granted in favor of the defendants, and the Eleventh Circuit Court of Appeals thereafter affirmed the district court's order. See Mega v. Byrne, 31 Fed. Appx. 942 (11th Cir. Jan. 28, 2002).

The facts of the present case are similar to those in Byrne. Here, the record shows

that, in July of 2003, this Court advised Club Exotica that its "as-applied" constitutional challenges to the Alcoholic Beverage Code were not yet ripe for review because the club had not yet been advised by a County official "having sufficient authority" that its alcoholic beverage license was in danger or that it may not otherwise operate under the "mainstream performance exception."[20]   Shortly thereafter, Club Exotica was formally notified that revocation of its alcoholic beverage license had been recommended to the Board of Commissioners, and an administrative revocation hearing was held.   Upon hearing the evidence presented, the Board of Commissioners voted to revoke the club's alcoholic beverage license.   At this time, the club could have returned to this Court and litigated its federal constitutional claims. Club Exotica, however, voluntarily chose to file a *writ of certiorari* to the state Superior Court, undisputedly a court of competent jurisdiction.

During this year long process, Club Exotica took no action in this Court, and once before the Superior Court, Club Exotica argued that the County's enforcement of the Alcoholic Beverage Code was selective and/or arbitrary in violation of its rights to due process and equal protection under the state constitution and that the revocation hearing denied Club Exotica its state constitutional right to procedural due process.   No federal equal protection or due process claims were asserted before the Superior Court.   Upon consideration of the state constitutional claims before her, Judge Christian found Club Exotica's arguments to be without merit. With respect to the club's substantive due process and equal protection claims, Judge Christian specifically found "no evidence to suggest that

---

[20]

No other claims were affected by the Court's July 2003 Order.   This Court also never required Club Exotica to pursue state court litigation prior litigating any claims in this Court or stayed this case while state litigation was pending.

the equal protection rights of [the club] were violated" by Sheriff Modena's investigation of its operations and that the club's claims alleging that the County unconstitutionally "piled on" violations in order to make a revocation case were not supported by any "legal authority to suggest that this action was improper."  (See Doc. 104, Deft. Ex. 18, Order of the Superior Court of Bibb County, June 11, 2004 at 6 and 8).

Club Exotica filed a discretionary appeal of the Superior Court's ruling, and it was denied.  Then, following these adverse judgments, Club Exotica returned to this Court and sought to pursue its federal equal protection and due process claims arising out of the County's investigation - which had essentially just been litigated in the state courts.  Much like the plaintiff in Byrne, Club Exotica had a full and fair opportunity to litigate these equal protection and due process issues at the state level before a court of competent jurisdiction prior to pursuing the claims in federal court.

On summary judgment, Club Exotica does not contest whether its state court litigation makes these claims subject to the *res judicata* principles cited in Byrne.  (See Doc. 185 at 17).  The club does contend, however, that it "attempted" to reserve its federal claims prior to going through the administrative procedure and to the state courts.  (Id.) Although there is no evidence before this Court to suggest that Club Exotica announced its intention to reserve its federal claims when before the state courts, this Court will acknowledge that, on at least one occasion, Club Exotica announced before this Court, on the record, that it intended to reserve its rights to litigate its then pending federal claims in federal court even if an administrative review by the County was pursued. Yet, even assuming, without deciding, that the statement before this Court qualified as a valid

58

announcement of Club Exotica's intention to preserve a federal forum for its then pending federal claims, the club's efforts in this respect were not sufficient to effectively preserve its right to federal judicial review.

Obviously, "the doctrine of *res judicata* in conjunction with 28 U.S.C. §1738 [the Constitution's full faith and credit clause] precludes a plaintiff from pursuing a claim previously litigated in state court;" thus, a plaintiff may only preserve access to federal courts by "'reserv[ing] [its] constitutional claims for subsequent litigation in federal court by making on the state court record a reservation as to the disposition of the entire case by the state courts." Saboff v. St. John's River Water Mgmt., 200 F.3d 1356, 1359-60 (11th Cir. 2000) (quoting Fields v. Sarasota Manatee Airport Auth., 953 F.2d 1299, 1303 (11th Cir. 1992)).  For such a reservation to be effective, the federal court litigant "must be [1] precluded from filing his or her suit in the federal court in the first instance and [2] must be in state court involuntarily." Id. at 1360 (citing Fields, 953 F.2d at 1306).  Thus here, even assuming that Club Exotica's statement of intent to reserve its right to federal judicial review before this Court was sufficient to meet the first requirement of an effective reservation, Club Exotica has not met the second and third requirements.  Club Exotica was not precluded from bringing these issues before this Court when the *writ of certiorari* to the state court was filed and was not in state court involuntarily.

Moreover, even if Club Exotica's selective/arbitrary enforcement claims are not barred by the doctrine of *res judicata*, Club Exotica has failed to raise triable issue with respect to such claims.  Inasmuch, this Court would reach the same conclusions as the Superior Court of Bibb County.  Here, on summary judgment, the parties' discussions of

these claims are quite brief.  This Court assumes that, through these claims, Club Exotica contends that the County selectively investigated its venue and selectively sought enforcement of the Alcoholic Beverage Code in situations when other similarly situated venues were treated differently.  Club Exotica appears to allege that Sheriff Modena, at the direction of the County attorney,[21] specifically targeted Club Exotica for investigation and criminal sanction because of its interest in nude entertainment and subsequently "piled-on" alleged violations of the Alcoholic Beverage Code while other night clubs in the County were either not subject to enforcement of the Alcoholic Beverage Code or at least informally notified when they were suspected of any ordinance violation.[22]

It is well-settled, however, that to prevail on an equal protection claim of selective enforcement, the plaintiff must establish (1) that it has been singled out for prosecution while others who are similarly situated have not been prosecuted, and (2) that the selection of the plaintiff for prosecution was invidious or in bad faith.  Geaneas v. Willets, 715 F. Supp. 334, 340 (M.D. Fla. 1989) (citing Lanier v. City of Newton, 842 F.2d 253, 256 (11th Cir. 1988); Fillingim v. Boone, 835 F.2d 1389, 1399 (11th Cir. 1988)).  Club Exotica has

---

[21]

For the purpose of this argument, the Court will assume that the Bibb County Sheriff's Office, if operating at the direction or request of the county attorney, was acting as an arm of the County rather than an arm of the State so as to preclude the application of Sovereign Immunity. Sheriff Modena admitted as much in his deposition stating that during his investigation, he was working in part for the "commission," meaning the County.  (Modena Dep. Jan 13-14, 2005 at 104).

[22]

Club Exotica also seems to make an equal protection claim based on the fact that its dancers were arrested on the night of the August 16, 2003 raid while male patrons subjected to similar charges were released; however, such a claim is one for the individual dancers and not Club Exotica to make. As such, this is not a ground for which Club Exotica has standing to claim that its constitutional rights were violated.

failed to meet the first prong of this test.  There is nothing before the Court, other than Club Exotica's unsupported allegations, to establish that Club Exotica was treated differently than other similarly situated venues.  Nothing in the record suggests that §3-71(c) of the Alcoholic Beverage Code was enforced almost exclusively against those venues providing nude dancing entertainment.  Contra Geaneas, 715 F. Supp. at 340.  Likewise, nothing is identified in the record to establish that any nightclubs allegedly treated differently than Club Exotica were "similarly situated."

In its brief, Club Exotica identifies only one other venue, assumably in Bibb County, and generally announces that this venue, "Club South Beach," "has been permitted to run a horrible business" and "is a haven for drugs, beatings, rapes, stabbings, underage sales, and even flagrant racial discrimination."  Even taken these allegations as true, Club Exotica fails to point this Court to any evidence that "Club South Beach" may be considered "similarly situated" to Club Exotica for the purposes of an equal protection analysis.  The club's only cited evidence on this issue is a single statement by an employee of the Bibb County Sheriff's Office, who opined that "Club South Beach" would be the business in Bibb County she would pick as the "most similar to Club Exotica." (See Depo. Cpt. Lynn Eason, Jan. 14, 2005 [Doc. 162] at 93).  This lay opinion is clearly insufficient to establish that the two venues are "similarly situated" as a matter of law.  Moreover, Club Exotica failed to point this Court to any evidence in the record establishing that "Club South Beach" has in fact been treated differently than Club Exotica with respect to investigation and ordinance violations.[23]  In its brief, the club makes only the bold,

---

[23]

In another portion of its brief, Club Exotica references the depositions of Investigator Derrick

unsupported allegation that Sheriff  Modena "has allowed [Club South Beach], which is owned by his friend, to continue virtually unabated."  (See Doc. 185 at 27).  Certainly, this Court may not simply assume that disparate treatment took place, and without direction to the requisite evidence, Club Exotica's equal protection claim cannot stand.  See Artistic Entm't, Inc. v. City of Warner Robbins, 2005 WL 1189627 * 3 (11th Cir. May 20, 2000) (herein "Artistic III") (holding that plaintiff's equal protection claim failed because it did not present "evidence from which a reasonable jury could conclude similarly situated establishments were treated differently").

With respect to its substantive due process claims, Club Exotica additionally contends that the County unconstitutionally "piled-on" violations of the Alcoholic Beverage Code to make a case for license revocation. On summary judgment, neither party has attempted to identify how this action is a violation of Due Process or the relevant standard to be applied to such claims.  Nevertheless, the un-rebutted evidence cited by the County shows that, in early 2002, Sheriff Modena instituted an investigation using undercover officers to determine whether any unlawful activities were going on at Club Exotica. (Doc. 104, Deft. Ex. 9 at 22).  Sheriff Modena further indicated that he felt limited in his ability to take action with respect to any violations of the County's ordinances at this time because

---

Henderson and Lieutenant Richard Crooms, both of the Bibb County Sheriff's Office, for the proposition that other clubs may have been subject to stings and citations but not alcoholic beverage license revocation like Club Exotica. Having reviewed the cited pages, the Court finds that the testimony cited does not support the representations made by the club. (See Doc. 185 at 17) (citing Henderson Depo., Jan 21, 2005 [Doc. 165] at 17, 59; Crooms Depo., March 17, 2005 [Doc. 167] at 57-60). The testimony of Derrick Henderson actually undermines Club Exotica's claims because it suggests that Club South Beach was subjected to similar investigations as Club Exotica. (See Henderson Depo. at 20-24) (detailing the intensive long term, undercover investigation taken place at Club South Beach which was similar to that conducted at Club Exotica).

of the federal litigation that was ongoing and the County's related representations to this Court that no action would be taken against the club in that respect. (Id. at 22-23). Sheriff Modena nevertheless continued his investigation and at some point determined that performances at the club had progressed to the point of violating state law. (Id. at 25).

Based upon this evidence, the Court concludes that Sheriff Modena first refrained from citing the club for ordinance violations in large part because of this Court's tentative agreement with the parties. Sheriff Modena then refrained from acting until it had accumulated evidence of actual criminal offenses. Criminal investigations of this sort would obviously be compromised if a court were to require that law enforcement advise the target of an investigation that they were being observed. And, as the Bibb County Superior Court noted, it simply "defies logic to assert that a determination should have been made by [the County] after gathering and considering as little evidence as possible" in this case. (Doc. 104, Deft. Ex. 18 at 8). This Court is therefore not inclined to find any constitutional violation based upon Sheriff Modena's alleged "piling-on" of violations. For all these reasons, the Court finds that summary judgment is due to be **GRANTED** in favor of the County with respect to the club's equal protection and due process "piling-on" claims.

B. First & Fourth Amendment Claims.

With respect to its First Amendment claims, Club Exotica contends that the County unconstitutionally targeted Club Exotica for investigation and license revocation in retaliation for its provision of constitutionally protected nude entertainment[24] and that the

---

[24]

On summary judgment, Club Exotica also appears to raise a new First Amendment claim that the County, by and through Sheriff Modena, unconstitutionally retaliated against it for

63

County's subsequent raid of the club on August 16, 2003 served as an unconstitutional prior restraint of free expression. The Club further contends that the County's warrantless raid of its premises also violated its right to be free of unreasonable searches as guaranteed by the Fourth Amendment.

### 1. *First Amendment Retaliation Claims*

There is no question that "[g]overnmental action designed to retaliate against and chill [protected] expression strikes at the heart of the First Amendment." Mendocino Envtl. Ctr. v. Mendocino County, 14 F.3d 457, 464 (9th Cir. 1994). As such, "[a]ny form of official retaliation for exercising one's freedom of speech, including prosecution, threatened prosecution, bad faith investigation, and legal harassment, constitutes an infringement of that freedom." Smith v. Plati, 258 F.3d 1167, 1176 (10th Cir. 2001) (quoting Worrell v. Henry, 219 F.3d 1197, 1212 (10th Cir. 2000)). "[I]f government officials were permitted to impose serious penalties in retaliation for an individual's speech, then the government would be able to stymie or inhibit his exercise of rights in the future and thus obtain indirectly a result that it could not command directly." Keenan v. Tejeda, 290 F.3d 252, 258 (5th Cir. 2002).

Unfortunately, on summary judgment, neither party attempts to articulate the applicable standard to be applied in reviewing such claims. Fundamentally speaking,

---

seeking declaratory and injunctive relief before this Court. (See Doc. 185 at 30). However, no such ground for relief was raised in Club Exotica's Second Amended Complaint, and thus, it may not be raised for the first time on summary judgment. See Flanigans Enter., Inc. of Ga. v. Fulton County, 242 F.3d 976, 988 (11th Cir. 2001); Gilmour v. Gates, McDonald & Co., 382 F.3d 1312, 1314 (11th Cir. 2004); Cooley v Great So. Wood Preserving, 2005 WL 1163608 *3 (11th Cir. May 18, 2005) ("A plaintiff may not amend [its] complaint through argument in a brief opposing summary judgment.").

however, to prevail on a retaliation claim in this context, it seems that Club Exotica must at least show (1) that its conduct was in fact protected by the First Amendment; (2) that the defendants took an adverse action against the club, which would chill a person of ordinary firmness from continuing to engage in that activity; and (3) that adverse action was substantially motivated or caused by the club's exercise of its First Amendment rights.  See Keenan, 290 F.3d at 258; Smith, 258 F.3d at 1176; Arrington v. Dickerson, 915 F. Supp. 1516, 1525 (M.D. Ala. 1996). A majority of circuit courts of appeals further require a plaintiff alleging retaliation to additionally show that his expression was in fact curtailed in someway by the adverse action taken.  Keenan, 290 F.3d at 259; Suarez Corp. Indus. v. McGraw, 202 F.3d 676, 686 (4th Cir. 2000); Spear v. Town of West Harford, 954 F.2d 63, 67 (2d Cir. 1992); Sullivan v. Carrick, 888 F.2d 1, 4 (1st Cir. 1989); but see Mendocino Envtl. Ctr. v. Mendocino County, 192 F.3d 1283, 1300 (9th Cir. 1999) (requiring only that plaintiff show defendants "intended to interfere" with plaintiff's First Amendment rights).

In this case, Club Exotica first contends that the County, by and through Sheriff Modena, instigated a formal investigation of its premises in retaliation for its stated intent to provide totally nude entertainment at its venue in April of 2002.  It is undisputed that "nude dancing" is conduct protected by the First Amendment, and that about the same time that Club Exotica publicly announced its intention to provide nude entertainment within the scope of the "mainstream performance house exception," Sheriff Modena began investigating the activities of the club.  On summary judgment, however, the County argues that Club Exotica cannot establish the third prong of a retaliation claim because there is insufficient evidence that Sheriff Modena's investigation was substantially motivated or

65

caused by the club's exercise of its First Amendment rights.  The County contends that its actions, by and through the Bibb County Sheriff's Office's investigation of Club Exotica, were conducted pursuant only to legitimate law enforcement initiatives and were not directed at silencing the club's exercise of protected nude dancing. See Mendocino, 192 F.3d at 1301 ("a plaintiff may not recover merely on the basis of a speculative 'chill' due to generalized and legitimate law enforcement initiatives").

In support of this contention, the County shows that the investigation initiated in April of 2002 was a standard investigation (consisting of so-called undercover "pass-bys") that the Sheriff's Office periodically conducts in all venues licensed to sell alcoholic beverages in the County to ensure alcohol ordinance compliance.  (Doc. 104, Deft. Ex. 10 at 29; 32).  Modena specifically testified that the investigation into Club Exotica was not prompted by the club's stated intent to dance totally nude or by their filing of a federal lawsuit.  (Id. at 29-30). According to Modena, the club initially "looked good" when the first "pass-bys" were conducted; but, in subsequent visits, his deputies began to notice questionable conduct.  (Id. at 29).  After the present lawsuit was filed, Sheriff Modena spoke with the county attorney about his concerns and was told to refrain from taking any action against the club for any Alcoholic Beverage Code violations.  (Id. at 30-31).  Sheriff Modena further testified that only after the lawsuit was filed did the County's attorney request that his office assist them in this civil litigation.  (Id.).

Such evidence suggests that the investigation of Club Exotica was initiated pursuant to legitimate law enforcement initiatives and was not directed at silencing the club's protected expression. Once the investigation was lawfully initiated and illegal activities

66

were suspected, the First Amendment would not require that the investigation be ceased simply because the club was purveying protected expression. Criminal conduct is not protected by the First Amendment, and thus no unconstitutional retaliation can be found when suspected criminal conduct "substantially motivated" the government's actions.

Club Exotica completely fails to address this retaliation issue in its response to the County's motion for summary judgment. (See Doc. 185 at 29-30). However, in response to the County's statement of material fact on this issue, (See Doc. 171 at ¶ 31), Club Exotica cites to the affidavit of Deputy Sheriff Herman Sampson, who testified that he was put in charge of the Club Exotica "investigation" in April of 2002. Sampson states that, at that time, he was directed to determine if any illegal activity was taking place at Club Exotica; he was also specifically instructed to "see how much alcohol was being served, "how much food was being consumed," "what the entertainers were wearing," and "what they were doing." (Sampson Aff. [Doc. 181] at ¶ 4). Sampson testified that he was told by supervisors to "see how far [he] could go with the female dancers" - meaning that he was to see if he could get them to "do something that they were not supposed to do." (Id.).

The testimony of Deputy Sampson is not inconsistent with the statements made by Sheriff Modena. It simply reinforces the Sheriff's claim that he was conducting an investigation into ordinance compliance and that this investigation was escalated once violations were identified. The affidavit does not raise a triable issue as to whether the investigation was "substantially motivated" by the club's exercise of protected speech. Club Exotica, in fact, fails to point to any evidence establishing that Sheriff Modena actually knew of the club's intent to dance totally nude when the investigation was initiated,

and it is undisputed that no nude entertainment was being provided by the club at that time. For these reasons, the Court finds that Club Exotica has failed to raise a genuine issue as to whether it was unconstitutionally targeted for investigation by the Bibb County Sheriff's Office in retaliation for its provision of constitutionally protected nude entertainment.

To the extent that Club Exotica additionally challenges the raid of August 16, 2003 and the subsequent revocation of its alcoholic beverage license as being retaliatory in violation of the First Amendment, such claims also fail as a matter of law.  The un-rebutted evidence before the Court is that, at some point in 2003, Sheriff Modena determined that criminal offenses, and not mere ordinance violations, were occurring at Club Exotica. (Doc. 75 at 61).  Before this Court, Sheriff Modena in fact testified that they "began to see violations with the touching . . . and then they got to a point that we saw that actually state law violations were taking place . . ." and that "because we had touching, we had people that were sitting on laps and grinding and causing sexual arousal and those type of things . . . I felt like from a law enforcement standpoint I needed to move on it." ( Id.).  Prior to the raid, officers were told that "nudity itself would not be reason to make an arrest." ( Id. at 62).  When the raid was subsequently executed, dancers and patrons were charged with criminal "public indecency" and "masturbation for hire" under Georgia's criminal code. (Id.).  There is no evidence before the Court that dancers were charged simply for being nude, and Club Exotica itself has conceded that a reasonable officer may have believed that the conduct described by the undercover officers violated Georgia law. (See Doc. 75 at 40).

As discussed above (part I.A.1, *supra*), the conduct which motivated Sheriff Modena to taken action in this case is not of the type protected by the First Amendment;

it was possibly even criminal. Clearly, action taken by the government in response to suspected criminal conduct may not be considered retaliatory in violation of First Amendment. Club Exotica, therefore, has not raised a genuine issue as to whether the raid was "substantially motivated" by the club's exercise of its First Amendment rights.

The same is true with respect to the County's decision to revoke the club's alcoholic beverage license.  The evidence at bar establishes that during the September 2003 hearing on the matter, the County Board of Commissioners were provided with a substantial amount of evidence regarding the conduct occurring during "lap dances" performed at the club.  Club Modena's letter to the Commissioners in fact detailed conduct such as lap dancing, prostitution, and oral sodomy. (Doc. 104, Deft. Ex. 13). The Commissioners were informed that dancers were grinding their genitals on patrons' groins, placing their breast and genitals in patrons' faces, and that patrons were allowed to make physical contact with the dancer's genitals "in various manners."  (Id.)  The evidence later presented to the Commissioners at the hearing showed that performers were observed sitting on patrons' laps, gyrating, putting their breasts and/or vagina on the patron's face, rubbing their buttocks on the patron's penis, and simulating the performance of oral sex. (See Doc. 104, Deft. Ex. 9 at 106; 112; 115; 135; 137). Witnesses further testified that this physical contact between dancers and patrons was intended to stimulate the patron sexually and that prostitution services were even offered to one undercover officer. (Id. at  106-07; 112-13; 119; 137).  The County additionally entered a video tape into evidence, which actually depicted lap dances being performed at the club. (Id. at 138-141).

Again, as discussed above (part I.A.1, *supra*), the conduct occurring during Club

Exotica's "lap dance" performances falls outside the perimeter of the First Amendment's protection. Thus, the County's decision to revoke Club Exotica's alcoholic beverage license also cannot be deemed retaliatory because Club Exotica has not raised a genuine issue as to whether the action taken was "substantially motivated" by the club's exercise of a recognized First Amendment right. For all the reasons discussed above, summary judgment is due to be **GRANTED** in favor of the County with respect to Club Exotica's First Amendment retaliation claims.

2. *First Amendment Prior Restraint Claim*

Club Exotica additionally contends that Sheriff Modena's arrest of its dancers on August 16, 2003 served as an unconstitutional prior restraint of free expression in violation of the First Amendment. Preliminarily, the Court notes that the circumstances surrounding the arrests do present an interesting blend of the protections offered by the First and Fourth Amendments. Surely, "[t]he use by government of the power of search and seizure as an adjunct to a system for the suppression of objectionable [expression] is not new," and "[i]n the context of adult dance clubs, the power of arrest can serve . . . to suppress . . . such unpopular activity." Alexis, Inc. v. Pinellas County, Fla., 194 F. Supp.2d 1336,1347 (M.D. Fla. 2002), *affirmed*, 88 Fed. Appx. 384 (11th Cir. Nov. 18, 2003) (internal cites omitted). Such circumstances may thus serve as both an impermissible prior restraint under the First Amendment and unreasonable seizure in violation of the Fourth Amendment.

Yet, as recognized by another district court within this circuit in a case similar to the one at bar, "the protections of the First Amendment are not absolute and prior restraints are not unconstitutional *per se*." Id. (citing Southeastern Promotions, Ltd. v. Conrad, 420

U.S. 546, 558 (1975)).  A system of prior restraint may be upheld as constitutional "if it takes place under procedural safeguards designed to obviate the dangers of a censorship system." Alexis, 194 F. Supp.2d at 1347 (citing Southeastern Promotions, 420 U.S. at 559). "Merely labeling the Sheriff's [Office's] actions prior restraint does not end the inquiry." Alexis, 194 F. Supp.2d at 1347.

In Alexis, the Middle District of Florida squarely addressed the issue of prior restraint in the context of widespread arrests executed in a club which provided nude or semi-nude dancing.  See 194 F. Supp.2d at 1347-48.  There, the court proceeded under the assumption (as will this Court) that arrests of exotic dancers during or prior to the completion of their evening performances can result in a prior restraint "at least to the extent that some dance performances were lost" for the remainder of that evening.  Id. at 1347.  Nevertheless, upon considering the relevant law, the Alexis court found that such arrests are not impermissible prior restraints where probable cause existed for the arrests themselves.  Id.  The court reasoned that the Fourth Amendment's probable cause standard "provides an adequate safeguard to First Amendment concerns." Id. at 1347.  Additionally,

> [a]fter the restraint is imposed, other safeguards kick in automatically. Promptly upon the dancers' arrests, the judicial system imposes its panoply of safeguards to assure the rights of the dancers are further protected and to minimize the censorship. Included in these rights is the right to release from custody through bail or otherwise and the right to thereafter contest the allegations. In this case, once the dancers were released, they were immediately free to again eng

Id. at 1348.  The court also noted that "[although the plaintiff businesses temporarily lost the services of arrested dancers, and to that extent, their right to purvey such expressive material and make money therefrom, they were not closed down by these arrests, and significantly, none were prohibited from continuing to offer dance performances by other

dancers." <u>Id.</u>  Based on these findings the district court concluded that "even in the face of a loss of dance performances," the arrests did not present an impermissible prior restraint because the arrests were supported by probable cause.  <u>Id.</u>

This Court finds <u>Alexis</u> to be on-point for the present case and agrees with both the rationale and conclusions of that court.[25] The First Amendment's prohibition of prior restraint certainly does not restrict the legitimate enforcement of criminal laws.  While free expression is of course critical to the liberties that our Constitution seeks to protect, the right to free expression under the First Amendment may not be used as a shield against prosecution for blatantly unlawful conduct.  "Regardless of the quantum of protection afforded the dancers by the First Amendment, they may not claim to be insulated from punitive actions against their misconduct merely because it occurred during a dance." <u>Id.</u> at 1347.  This Court therefore agrees that where probable cause exists for an arrest of an erotic or nude dancer, the arrest does not pose an unconstitutional prior restraint of her expression or her employer's First Amendment right to purvey such expression.

Thus, the critical issue at bar is whether the August 16, 2003 warrantless arrest of Club Exotica's dancers was supported by sufficient probable cause as required by the Fourth Amendment.  Here, the un-rebutted evidence shows that, on the night of August 16, 2003, undercover officers observed Club Exotica's entertainers engaging in simulated

---

[25]

This Court, however, does not adopt the <u>Alexis</u> court's view that nude dancing is only entitled to "minimal protection" under the First Amendment. While such expression may fall only in the outer ambit of the First Amendment's protection, the strength of the protection provided by the First Amendment is no lesser than that provided for any other type of protected speech. Nude dancing is barely covered (no pun intended) by the First Amendment, but it does not receive lesser constitutional protection.

sexual activity. (Deft. Statement of Material Fact ¶ 47 [Doc. 104]).  Nude dancers were generally observed touching patrons, sitting on patrons' laps and "grinding" their genitals on the patrons' legs. (See Doc. 75). Officers have further testified that Club Exotica's dancers were actually observed performing oral sex on patrons, engaging in other physical contact with patrons continuing to the point of ejaculation, opening their vaginas while placing it in close proximity to the patron's face, rubbing or slapping their breast on the patron's face, grinding their genitals or buttocks on the laps of patrons, allowing patrons to use their hands and mouths to place paper money in dancers' vaginas or buttocks, and even permitting  patrons to insert their fingers into dancers' vaginas. (See Deft. Statement of Material Facts [Doc. 104] ¶¶ 34, 46-47).  The dancers, of course, received money for performing these acts with patrons. (See id.; Doc. 104, Deft. Ex. 9 at 107; 116).

The officers' personal observations of such behavior certainly serves as probable cause to arrest the dancers committing the acts.  The relevant standard for determining the existence of probable cause is whether "a reasonable man would have believed probable cause existed had he known all the facts known by the officer." Rankin v. Evans, 133 F.3d 1425, 1433 (11th Cir. 1998).  As such, an officer may properly arrest an individual without violating the Fourth Amendment if he reasonably believes that a criminal offense has been committed in his presence.  See Atwater v. City of Lago Vista, 532 U.S. 318, 340 (2001).  As discussed earlier, Georgia's public indecency statute prohibits the act of sexual intercourse, lewd exposure of sexual organs, and lewd caress or indecent fondling of the body of another person in public, O.C.G.A. §16-6-8; Georgia's criminal prohibition of masturbation for hire similarly bans the erotic stimulation of the genital organs of another

(by any bodily contact) for money. O.C.G.A. §16-6-16. This Court finds that, based on the conduct personally viewed by the officers on the night of August 16, 2003, a reasonable person could believe that probable cause existed to arrest those dancers for violations of Georgia law. During the August 26, 2003 hearing before this Court, Club Exotica's attorneys in fact conceded as much. (See Doc. 75 at 40).

Moreover, it is undisputed that neither Club Exotica nor its owners were charged with any criminal conduct or ordinance violations on the night of the raid. (Pl.'s Response to Deft.'s Statement of Material Fact [Doc. 171] at ¶ 53). No action was taken with respect to the club's liquor license that evening, and the club was not forced to close. The club could have theoretically continued to operate on August 16, 2003; it in fact re-opened for business shortly thereafter and continued to provide nude entertainment for its patrons. Thus, while some constitutionally protected dance performances may have been temporarily lost by Club Exotica in the wee hours of the night, it was not closed down by the arrests, and significantly, it was not prohibited from continuing to offer dance performances by other dancers. Compare Alexis, 194 F. Supp.2d at 1348. As such, the club's right to provide such expressive material remained largely intact, despite the arrests.

On summary judgment, however, Club Exotica contends that evidence supports a finding of prior restraint in this case because only the female dancers and not the associated male patrons were arrested for violations of Georgia law; apparently, only the dancers were taken to jail while the males were released with citations. In response, the County argues that the decision whether to take an offender into custody or leave him with a citation is a

74

matter well within the law enforcement officer's discretion.[26]  Yet, regardless of how the officers may have subjectively justified the disparate treatment of the offending persons in this case, the evidence currently at bar suggests that probable cause did exist to arrest the dancers. Where adequate probable cause exists for an arrest, any impermissible subjective motivation that the officer may have had for the arrest is irrelevant.  Rankin, 133 F.3d at 1433-34.  Thus, because probable cause existed for the arrests, adequate safeguards were in effect to protect against constitutional infirmities, and the arrests did not present an impermissible prior restraint in violation of the First Amendment as a matter of law.  See Alexis, 194 F. Supp.2d at 1347-48.  Summary judgment is therefore **GRANTED** in favor of the County as to this prior restraint claim.

      3.    *Fourth Amendment Claims*

Aside from the arrests executed by the officers, Club Exotica claims that its own Fourth Amendment rights were violated by the Bibb County Sheriff's Office's raid and ensuing search of its premises on August 16, 2003.  Club Exotica contends that the entrance and search on the night of the raid was warrantless and objectively unreasonable in violation of the Fourth Amendment.  In making this argument, Club Exotica relies heavily upon Swint v. City of Wadley, 51 F.3d 988 (11th Cir. 1995).

---

[26] The County suggests  that the officers chose to take the offending dancers into custody so that their actual identities may be reliably ascertained; the dancers were performing under stage names at the time they were arrested.  The County likewise proposes that there was a greater anticipated risk of flight from authorities by the offending dancers than their male cohorts. This Court also notes that given the nature of the crimes committed, the dancers would be more likely to have criminal histories or outstanding arrest warrants for similar conduct than their patrons and that such information can often be more efficiently determined if the offender is in custody.

The lawsuit in <u>Swint</u> stemmed from two law enforcement raids of a night club where it was suspected that drug transactions took place. 51 F.3d at 992.  As part of the raids, a single undercover officer and confidential informant entered the club while other officers waited outside.  <u>Id.</u> at 993.   Once inside, the undercover officer was offered marijuana and crack cocaine by a club patron.  <u>Id.</u>  The officer purchased the drugs and then signaled for the raid to begin. <u>Id.</u>  Eight officers initially entered the club, dressed in black and wearing ski masks.  <u>Id.</u>  Officers searched the club's cash register and door receipts; other persons inside the club were searched and prohibited from leaving until the raid was over.  <u>Id.</u>  Only two people were arrested as a result of the two raids.  <u>Id.</u>  The patron who actually sold drugs to the undercover officer and his brother were arrested during the first raid; no one was arrested in the second.  <u>Id.</u>

In the course of determining whether the law enforcement officers in <u>Swint</u> were entitled to the defense of qualified immunity, the Eleventh Circuit concluded that the defendant officers did not have arguable probable cause to conduct the extensive raids of the club's premises, "which included a search of the premises, the seizure of all employees, patrons, and owners present, and the search of some of those detained." <u>Id.</u> at  996.  The court noted that, although a confidential informant had provided the officers with names of several individuals allegedly involved with the sale of drugs at the club prior to the raid, "none of those persons identified by these informants were owners or employees of the club." <u>Id.</u>  Furthermore, the officers in <u>Swint</u> only completed a single drug buy from one patron inside the club before each raid commenced; thus, any probable cause to search would have been limited to the single narcotics peddler involved.  <u>Id.</u> at 997. Significantly,

the drug seller was identified and arrested within minutes of the first raid beginning. Id.  No additional search of the premises or detention of others was warranted thereafter. The circuit court concluded that the search and seizure of one suspect in a public place cannot be bootstrapped into probable cause for a broad-based search of the business establishment and its patrons.  Id.  As such, the court found that the search of the entire club was "presumptively unreasonable" under the Fourth Amendment.  Id. at 996-97.

In a subsequent case, however, the Eleventh Circuit factually distinguished Swint. See Crosby v. Paulk, 187 F.3d 1339, 1350 n.14 (11th Cir. 1999). Crosby also involved a Fourth Amendment claim arising out of a raid of night club. 187 F.3d at 1343.  The raid in Crosby arose after a long term investigation into possible sales of alcoholic beverages to minors.  Id.  Forty law enforcement officer gathered and executed a raid of the club.  In course of the raid, the club was secured, the identifications of approximately 400 patrons were checked, and the premises were searched.  Id.   In its opinion, the Eleventh Circuit noted that the actions in Crosby were not to be compared to those in Swint.  Id. at 1350 n.14.  The circuit court explained that unlike in Swint, the officers in Crosby personally witnessed illegal conduct by the owners or employees of the club, which also involved patrons.  Id.  Additionally, in Swint only two people were arrested in the course of such a broad raids, and no charges were placed against the employees or owners of the club. Conversely, the raids in Crosby resulted in seventy-seven arrests and fifty-four convictions, as well as numerous citations against the owners and employees of the club.  Id. at 1343.

The facts of this case fall somewhere in between those discussed in Swint and Crosby.  The raid of Club Exotica was admittedly not an administrative search like the raid

in Crosby; however, the evidence accumulated by the Sheriff's Office in this case was much more apt to give the officer's arguable probable cause to believe that a full scale raid of Club Exotica was warranted than that evidence relied upon in Swint.  As the Swint panel explained, "[p]robable cause, a pure question of law, 'exists when under the totality-of-the-circumstances . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place.'"  51 F.3d at 996 (cites omitted).  "[F]acts which would lead a reasonably cautious person to believe that the search will uncover evidence of a crime will support a finding of probable cause."  Id. (internal quotes and citations omitted).

Here, the investigation of Club Exotica was extensive.  Numerous undercover operations had been conducted, and it was suspected that criminal conduct was both widespread in the club and possibly sanctioned by its management.  On the night of the raid, a number of undercover officers observed what they reasonably believed to criminal violations, not only by numerous patrons, but also by the club's own performers.  Only when these offenses were personally witnessed by the undercover officers was the raid commenced.  Officers apparently entered the club and detained both dancers and patrons alike for violations of Georgia's criminal code.  All dancers were arrested as a result, and numerous patrons left with criminal citations.  Depending on the exact scope of the search conducted at the club, a reasonably cautious person may have likely believed that a raid and search would have uncovered evidence of these crimes and assisted in the numerous arrests and citations of the offending persons.  Thus, unlike in Swint, the officers in this case may have had arguable probable cause to justify the execution of the raid.  This was not exactly a case where the search and seizure of *one* suspect in a public place was used to bootstrap

78

probable cause for a broad-based search of the business establishment and innocent patrons.

Still, as Club Exotica points out, the raid in this case was executed without a warrant, and "only in the face of 'exigent circumstances,' where obtaining a warrant would greatly compromise important law enforcement objectives, does the warrant requirement yield." Swint, 51 F.3d at 996. A warrantless search will only stand, therefore, "[w]hen exigent circumstances coexist with probable cause." Id. On summary judgment, neither party clearly addresses the scope of the search itself or the issue of whether there were "exigent circumstances" to justify a warrantless search at all. As a consequence, the Court is not quite clear as to how extensive the search was and what, if any, other criminal conduct was suspected on the premises to justify a search of the entire club without a warrant. Simply stated, there are insufficient facts currently cited to the Court with respect to the events occurring before and during the raid so as to find that the warrantless raid was constitutional. See U.S. v. Kempf, 400 F.3d 501, 503 (7th Cir. 2005) ("The existence of exigent circumstances is a mixed question of law and fact."). The County's motion for summary judgment is therefore **DENIED** as to this claim.

As an aside, however, the Court notes, *sua sponte*, that the extent of the County's liability for this conduct is also unclear. In this suit, Sheriff Modena is named as a defendant solely in his official capacity; as such, all claims against Sheriff Modena are in actuality claims against the Bibb County Sheriff's Office. Busby v. City of Orlando, 931 F.2d 764, 776 (11th Cir. 1991) (per curiam) ("when an officer is sued under Section 1983 in his or her 'official capacity,' the suit is simply another way of pleading an action against an entity of which the officer is an agent."). Such claims would not necessarily implicate

Bibb County; in many instances, a county sheriff is deemed to actually be acting as an arm of the State.  See Manders v. Lee, 338 F.3d 1304, 1328 (11th Cir. 2003)

Moreover, in Manders, the Eleventh Circuit Court of Appeals held that a county sheriff is entitled to Eleventh Amendment sovereign immunity when sued in his official capacity for acting as an "arm of the state." Id.  Here, evidence before the Court suggests that Sheriff's Modena's decision to conduct the raid and warrantless search of Club Exotica's premises arose not out of his duty to enforce the County's ordinances but out of his power to enforce state law. (Doc. 104, Deft. Ex. 9 at 25, 38-29; Doc. 75 at 61, 63). All dancers arrested were in fact charged with violations of the Georgia criminal code; none were issued ordinance citations. (Doc. 75 at 62; Doc. 104, Deft. Ex. 9 at 38).  Modena specifically notified his officers before the raid that mere nudity would not be cause to arrest a dancer; they were only to arrest individuals for criminal offenses.  (Doc. 75 at 62, 66).  This indicates that Sheriff Modena may have been acting as an "arm of the State" rather than an agent of the County at the time the raid and search were conducted and that he and the State would therefore be entitled to immunity for claims arising out this conduct.

However, the immunity issue was not properly raised and briefed by the parties on summary judgment.  As a consequence, the Court will not attempt to fully address the issue here.  Even so, this threshold issue should likely be addressed at some point. See Bouchard Transp. Co. v. Fla. Dept. of Envtl. Protection, 91 F.3d 1445, 1448 (11th Cir. 1996) (clarifying that while Eleventh Amendment Immunity is not jurisdictional in the sense that courts must address it *sua sponte*, it is nevertheless a threshold issue in the nature of a jurisdictional bar).

III.    **Constitutional Challenges to the Procedure in which Club Exotica's Alcoholic Beverage License was Ultimately Revoked.**

Finally, Club Exotica broadly contends that its right to procedural due process, as guaranteed by the Fourteenth Amendment of the United States Constitution, was violated through the process in which its alcoholic beverage license was ultimately revoked by the County. Again, because any grounds not specifically raised and rebutted on summary judgment are deemed abandoned, see Resolution Trust, 43 F.3d at 599, the Court will only address those procedural due process theories relied upon in the motions at bar.  On summary judgment, the club generally asserts that it was denied constitutionally adequate process in this case because: the County denied Club Exotica adequate notice and opportunity to be heard prior to the revocation of its alcoholic beverage license, the County unconstitutionally permitted the Board of Commissioners to determine whether the entertainment at Club Exotica was obscene or indecent in violation of state law, and the Board of Commissioners was a biased tribunal that impermissibly handpicked a Bibb County State Court judge to preside over the hearing.

This, however, is not the first time that Club Exotica has raised such claims before a court of competent jurisdiction.  As with the club's equal protection and substantive due process claims discussed above (part II.A., *supra*), the County contends that Club Exotica's procedural due process claims are barred by the doctrine of *res judicata*.  Again, the procedural history of the present case does show that following this Court's June 2003 Order on Club Exotica's motion for preliminary injunction, the club was notified by letter that Sheriff Modena had recommended the revocation of Club Exotica's alcoholic beverage

81

license and that the Board of Commissioners was considering such revocation.[27]   Club Exotica took part in the administrative hearing on the matter, and in that hearing, the Board of Commissioners unanimously voted to revoke the license. Club Exotica did not then return to this Court to assert federal procedural due process claims arising out of actual revocation of its license and no procedural due process claims (of any type) were then pending before this Court.  The club  instead opted to pursue state litigation by way of *writ of certiorari* to the Superior Court of Bibb County.

Before the Superior Court, Club Exotica raised numerous procedural due process claims under the Georgia Constitution, including claims that: (1) the club was not provided with meaningful notice of the allegations against it prior to the revocation of its alcoholic beverage license; (2) the Board of Commissioners unconstitutionally considered conduct occurring after July 22, 2003 when determining whether its alcoholic beverage license should be revoked; (3) the Board of Commissioners unconstitutionally determined whether violations of state law had occurred; and (4) the County failed to afford the club with subpoena rights to call its own witnesses during the hearing.  (See Doc. 104, Deft. Ex. 18 at 1).  Upon consideration of each these claims, Judge Martha Christian found them to be without merit.  Judge Christian specifically found that Club Exotica had received adequate notice of the allegations against it prior to the hearing and that the hearing provided was meaningful.  (Id. at 4-5).  The state court judge additionally concluded that the Board of

---

[27]

Although Club Exotica's brief suggest that its license was revoked by the Board of Commissioners during the July 22, 2003 public hearing, the evidence at bar only shows that the Board voted to deny the pending application for renewal at that time and that, during the initial public hearing, the Board only voted to grant Club Exotica a hearing on the revocation issue. (Doc. 104, Deft. Ex. 14).

Commissioners was not a biased tribunal and that the County did not act unconstitutionally by picking a State Court Judge to preside over the hearing.  (Id. at 6-8).  There is no contention that Club Exotica did not have a full and fair opportunity to present these claims to the state court.  Moreover, after the Superior Court's ruling, the club sought appeal from the Georgia Court of Appeals, and it was denied.

The circumstances of the present case essentially mirrors the situation in Mega v. Byrne, 2001 WL 1094904 (N.D. Ga. August 16, 2001), aff'd 31 Fed. Appx. 942 (11th Cir. Jan. 28, 2002) (discussed fully in part II.A. *supra*).  Club Exotica had no procedural due process claims pending before this Court when it availed itself of the County's administrative hearing on its license revocation; inasmuch, the claims had not yet arisen when Club Exotica was initially before this Court.  At the conclusion of the administrative hearing, Club Exotica did not choose to bring any procedural due process claims to this Court.  It instead elected to proceed with state litigation.  Although Club Exotica only brought state claims before the Superior Court, it could have brought its federal claims before that tribunal.  It, however, chose not to raise any federal claims at that time.

Undoubtedly, the Bibb County Superior Court is a court of competent jurisdiction. It is further apparent that Club Exotica had a full and fair opportunity to litigate its federal procedural due process claims at the state level but chose not to, and as stated above (part II.A. *supra*), Club Exotica does not contest whether the *res judicata* principles discussed in Byrne apply to this case.  Club Exotica, however, seemingly operates under the belief that it effectively reserved any federal constitutional claims in hopes of preserving access to a federal forum.  As discussed at length above, a plaintiff may only preserve access to

federal courts if it (1) reserves its federal claims for subsequent litigation in federal court by making on the state court record a reservation as to the disposition of the entire case by the state courts, (2) is precluded from filing his or her suit in the federal court in the first instance, and (3) is in state court involuntarily. See Saboff, 200 F.3d at 1359-60.

Again, here, there is no evidence at bar suggesting that Club Exotica reserved its federal procedural due process claims for subsequent litigation in the federal court on the state court record. Club Exotica likewise fails to show how it was prevented from filing its procedural due process claims in this Court before proceeding to state litigation. Rather, Club Exotica merely sat on its federal due process claims until over a year had passed and it had received adverse rulings from the state courts; only then did Club Exotica seek to bring such claims in this forum. Finally, there is nothing before the Court to suggest that Club Exotica filed its case in the Bibb County Superior Court involuntarily. The club has stated no legal mandate or court order requiring that it file a *writ of certiorari* in the state courts before it could litigate its federal due process claims in this Court. For these reasons, the Court finds that Club Exotica has failed to sufficiently rebut the County's arguments that its procedural due process claims are barred by the doctrine of *res judicata*.

Even if such claims are not barred by the doctrine of *res judicata*, the Court additionally finds that many of Club Exotica's arguments are not supported by the evidence at bar. First of all, the evidence demonstrates that Club Exotica was provided with sufficient notice of the allegations against it and fair opportunity to be heard before the County Commissioners revoked its alcoholic beverage license. Admittedly, on July 22, 2003, in a regularly scheduled public hearing, the Board of Commissioners first accepted

the recommendation that Club Exotica's alcoholic beverage license be revoked and voted to hold a subsequent due process hearing on the matter. (See Doc. 104, Deft. Ex. 14). This decision was based solely upon Sheriff Modena's recommendation, and Club Exotica did not receive notice prior to that vote. (Id.). Even so, absolutely no action was taken against the club's alcoholic beverage license at that time, and within three days of the public hearing, the County mailed the club a letter regarding the revocation of its alcoholic beverage license. (Id.). At this time, Club Exotica was additionally informed that it was entitled to a hearing on the matter and that a mutually agreeable date and time for the hearing would be set. (Id.) A week later, on July 31, 2003, the County then sent Club Exotica yet another letter advising the club of the reasons for the intended revocation and providing the club with a copy of the letter from Sheriff Modena to the Board of Commissioners, which explicitly described the allegations of unlawful conduct occurring at the club. (Doc. 104, Deft. Ex. 15). This second letter also provided notice that a hearing date had been set for August 14, 2003 — a date approximately fifteen days away. (Id.).

No hearing was held on August 14, 2003. Rather, on August 15, 2003, Club Exotica responded to the County in writing and requested an extension of time. The County, in a letter dated August 21, 2003, agreed to postpone the hearing until September 10, 2003 — a date approximately twenty days away. (Doc. 104, Deft. Ex. 16). In this letter, the County further put the club on notice that additional evidence regarding suspected state law violations occurring "through and including August 16, 2003" would be presented at the hearing. (Id.) Although this letter did not detail those allegations, the club was privy to much of this evidence, as it was fully presented during the August 26, 2003 hearing

85

before this Court on Club Exotica's motion for temporary restraining order.  During that hearing, Club Exotica not only heard the allegations of suspected criminal conduct but was additionally given the opportunity to cross examine the County's witnesses with respect to these allegations.  (See Doc. 75).  Based on these facts, the Court cannot find that Club Exotica was denied adequate notice of the hearing or of the allegations against it prior to the revocation hearing before the Board of Commissioners.

Likewise, during the revocation hearing, Club Exotica was represented by counsel, was able to hear the allegations against it, and was able to cross-examine each of the County's witnesses before the Board of Commissioners. (See Doc. 104, Deft. Ex. 9 at 143). The club was also given the opportunity to place its own evidence before the Board and to call its own witnesses.  The club, however, voluntarily declined to do so. (Id.)  Based on this, the only evidence currently at bar, the Court would not find that Club Exotica was denied a fair opportunity to be heard before the Board of Commissioners.

Additionally, the Court finds Club Exotica's allegations — that the Board of Commissioners unconstitutionally determined that the entertainment at Club Exotica was obscene or indecent in violation of state law — to be entirely unsupported by the evidence at bar.  In fact, upon a full review of the transcript of the revocation hearing, this Court is unable to find any evidence even suggesting that the Board of Commissioners actually determined that the entertainment at Club Exotica was obscene or indecent in violation of state law. Certainly, the evidence before the Board of Commissioners addressed, in large part, information accumulated just prior to the Sheriff's August 16, 2003 raid.  The Board accordingly heard evidence that the raid was initiated and arrests were made because of

86

*suspected* criminal conduct.  Still, the majority of the testimony actually addressed, in great detail, the exact conduct viewed by officers at the club.  This conduct included dance performances wherein the entertainers would sit on patron's laps and gyrate, expose their breasts and genitals, and simulate masturbation.  (See Doc. 104, Deft. Ex. 9).

At the conclusion of the evidence, the County's attorney then requested that the Board of Commissioners revoke the club's current alcoholic beverage license because of violations of §3-71 of the Alcoholic Beverage Code.  (Id. at 145-48).  Specific Georgia criminal statutes were never discussed and those standards were never placed before the Board of Commissioners.  The Board then voted to revoke the club's alcoholic beverage license. Unfortunately, the Board of Commissioners did not specifically articulate its reasons for the denial.  But, there is still no evidence that the County unconstitutionally permitted the Board of Commissioners to determine whether the club's entertainment was obscene or indecent in violation of state law.  No findings of obscenity or of lewdness were made by the Board of Commissioners, and no evidence of the relevant Georgia criminal statutes were even before the Board.  For all of these reasons, the Court finds summary judgment should be **GRANTED** in favor of the County with respect to Club Exotica's procedural due process claims.

### CONCLUSION

Ultimately, as with most cases, this is a case where the determination of the merits of the plaintiff's claims simply comes down to the substance of the evidence and arguments supporting them. There is no doubt that Club Exotica has made some persuasive and thought-provoking allegations throughout this litigation. The strength of these bare

87

allegations alone certainly gave this Court pause and good cause to closely scrutinize the justifications for the County's actions in this case. Yet, on summary judgment, Club Exotica simply failed in large part to support its broad and voluminous allegations with persuasive legal arguments and citations to the evidence. Accordingly, and for the aforementioned reasons, all but one claim are resolved in favor of Defendants Bibb County, Sheriff Jerry M. Modena, and John Doe. Defendants' motion for summary judgment is **GRANTED** as to all claims *except* Club Exotica's Fourth Amendment claim arising out of the warrantless search of its premises on August 16, 2003. Plaintiff's motion for partial summary judgment is **DENIED** in full, and Plaintiff's claims arising out of alleged constitutional infirmities in the County's Adult Entertainment Licensing Code are **DISMISSED** without prejudice.

      **SO ORDERED**, this 11th day of July, 2005.


                          s/ C. Ashley Royal
                          C. ASHLEY ROYAL
                          UNITED STATES DISTRICT JUDGE

JLR/lth